UNISTAR PROPERTIES, LLC *v.* CONSERVATION AND INLAND WETLANDS COMMISSION OF THE TOWN OF PUTNAM ET AL.
(SC 18321)

Norcott, Katz, Palmer, Zarella and McLachlan, Js.

Argued April 21—officially released August 18, 2009

*Kenneth R. Slater, Jr.*, for the appellant (plaintiff).

*Kathleen M. Cerrone*, with whom, on the brief, was *William H. St. Onge*, for the appellee (named defendant).

*Ernest J. Cotnoir*, for the appellees (defendant Celeste Chartier et al.).

*Opinion*

KATZ, J. The plaintiff, Unistar Properties, LLC, appeals[1] from the judgment of the trial court dismissing its appeal from the denial of its application for a wetlands permit by the named defendant,[2] the conservation and inland wetlands commission (commission) of the town of Putnam (town), in connection with a proposed subdivision on its property. The principal issue in this certified appeal is whether the commission properly denied the plaintiff's application for a wetlands permit as incomplete because it was missing certain information, including a sufficiently detailed wildlife inventory and an analysis of alternatives to the proposed activity. The plaintiff claims, inter alia, that, because it had established that its proposal would not result in a change to the physical characteristics of the wetlands and there was no evidence that an impact on animal species in turn could effect such a change, the commission has no authority under the governing statutes to demand such information.[3] To the extent that the commission was entitled to such information, the plaintiff also

[1] The plaintiff petitioned for certification to appeal from the judgment of the trial court to the Appellate Court, which was granted, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] In addition to the named defendant, the plaintiff named both the commissioner of environmental protection and the intervening defendants in the proceedings before the conservation and inland wetlands commission, Celeste Chartier and Barbara Caparulo, as defendants in this appeal. The commissioner of environmental protection has not filed a brief in this appeal.

[3] We note that, although the plaintiff has framed the issue as a challenge to the commission's authority to deny an application as incomplete on the basis of a lack of a sufficiently detailed inventory of *both* plant and animal species, the commission's decision refers solely to the absence of information on wildlife. We therefore treat the plaintiff's claim consistent with the actual basis of the commission's decision and principally focus our discussion on the commission's authority to request information on wildlife.

claims that the trial court should have remanded the case to the commission so that the plaintiff could provide the necessary information. We affirm the judgment of the trial court dismissing the plaintiff's appeal.

The record reveals the following undisputed facts and procedural history that are relevant to our resolution of this appeal. In accordance with its authority as the agency charged with the preservation and protection of wetlands and watercourses in the town, pursuant to the Connecticut Inland Wetlands and Watercourses Act (act), General Statutes § 22a-36 et seq., the commission has adopted wetlands and water courses regulations (regulations). Under these regulations, certain activities affecting an inland wetland or watercourse (regulated activities) require the issuance of a wetlands permit from the commission. See Putnam Wetlands and Water Courses Regs., §§ 2.1.7 and 2.1.8 (defining regulated activities and regulated areas).[4] The regulations set forth in detail the requirements and procedures governing wetlands permit applications, which include the requirement that applications must contain "a sufficiently detailed description of the proposed activity to permit the [c]ommission to evaluate its impact on the regulated area." Id., § 6.1. That description may be required to include information such as "[t]he types and extent of plant and animal species on the property

---

[4] Section 2.1.7 of the Putnam wetlands and water courses regulations provides: " 'Regulated activity' means any operation within or use of a wetland or water course involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or water courses, but shall not include the specified activities in Section 3 of these Regulations. All regulated activities will require a permit issued by the [commission]."

Section 2.1.8 of the Putnam wetlands and water courses regulations provides: " 'Regulated area' means any inland wetland or water course as may be shown on the Town Inland-Wetlands Map and is recognized as wetlands or watercourses by field inspection. (25 feet of designated Inland-Wetlands.)" The plaintiff does not challenge the validity of any of the regulations pertaining to wetlands.

and the probable affect of the proposed activity on these species." Putnam Wetlands and Water Courses Regs., § 6.1.3; see footnote 19 of this opinion.

The plaintiff is the co-owner[5] of a sixty-two acre parcel (property) located on Five Mile River Road in the town. The property contains five distinct wetland areas, including two "vernal pools" located in the center of the property that contain various wildlife and plant species. On May 3, 2006, the plaintiff filed an application for a wetlands permit with the commission in connection with a proposed thirty-four lot subdivision to be developed on the property. The subdivision was to be built outside the regulated area but included a roadway and cul-de-sac that would encircle the two vernal pools in the center of the property. Accompanying the application was a report dated May 1, 2006, written by Ian T. Cole, a soil scientist, that described the wetlands on the property and concluded: "The wetlands on-site primarily serve as areas of groundwater recharge and discharge, in addition to providing wildlife habitat. In my professional opinion, protection of the wetlands should focus on water quality. To preserve the wildlife habitat attributes of the wetlands there will be no disturbance of any inland wetlands or watercourses, or within the [fifty] foot upland review area." The report also noted that an artificial wetland would be constructed on the property and that the majority of any stormwater discharge from the property would be treated and diverted away from the natural wetlands and into the constructed wetland to avoid infiltrating the natural wetlands.

The commission forwarded the application to the Eastern Connecticut Conservation District, Inc. (con-

---

[5] The other co-owner listed on the application is Robert A. Lusi, who is not a party to this appeal.

servation district)[6] for its assessment. The conservation district identified two major concerns with the proposed subdivision. First, it identified the vernal pool wetlands in the center of the property as "high-quality" and recommended that the plaintiff increase the buffer area around those pools to 200 feet to protect the "function" of the pools. Second, the report concluded that, because surface runoff would be redirected away from the wetlands by the proposed roadway and other structures, the water supply to the wetlands would be "seriously compromised."

The commission conducted a public hearing on the plaintiff's application over the course of four evenings held over several months. The plaintiff provided expert evidence to support its conclusion that its proposed subdivision would not affect the wetlands on the property. Several neighboring property owners, two of whom had filed a timely notice of intervention (intervenors),[7] provided expert evidence that contradicted the plaintiff's conclusion. The intervenors' expert opined that the plaintiff's plan likely would affect the wetlands within the property adversely, but concluded that additional information was required to determine the extent of that impact. Finally, an expert retained by the commission concluded that the application was missing certain information required for compliance with the regulations, including an inventory of plant and wildlife

---

[6] Although the record does not indicate what the conservation district is, its website indicates that it is a nonprofit organization "dedicated to helping the towns and citizens of Eastern Connecticut with their conservation needs. . . . [The conservation district] assists citizens and towns in making sound natural resource decisions, and . . . promote[s] sustainable use of natural resources." See http://www.conservect.org/eastern/ (last visited July 2, 2009).

[7] The intervenors filed a notice of intervention with the commission, pursuant to General Statutes § 22a-19, asserting that the plaintiff's application for a wetlands permit "will have a negative effect on the air, water, and other natural resources and the physical environment of the [t]own . . . ."

species on the property and an evaluation of the impact of the proposed subdivision on those species. The plaintiff thereafter submitted a modified plan and additional evidence in an attempt to address some of these issues, but the intervenors' expert maintained that an adverse impact still was likely despite the modifications and that the application continued to lack sufficient detail to determine the extent of that impact.

Following the close of the public hearing, Commissioner Kathy Taylor moved to deny, without prejudice, the application as incomplete. She noted that the application lacked certain information necessary to address concerns that had been raised in the course of the public hearing, including a detailed wildlife inventory, or an analysis of alternatives to address those concerns. Thereafter, the commission denied the application as incomplete, with two commissioners voting to deny and three commissioners abstaining.

The plaintiff appealed from the commission's decision to the trial court, pursuant to General Statutes § 22a-43,[8] asserting primarily that, because its expert evidence had established that the proposed subdivision would not affect the wetlands, the commission could not, as a matter of law, deny the application as incomplete because it was not entitled to the information it requested, including a wildlife inventory. In support of

---

[8] General Statutes § 22a-43 (a) provides in relevant part: "[A]ny person aggrieved by any regulation, order, decision or action made pursuant to sections 22a-36 to 22a-45, inclusive, by the commissioner, a district or municipality or any person owning or occupying land which abuts any portion of land within, or is within a radius of ninety feet of, the wetland or watercourse involved in any regulation, order, decision or action made pursuant to said sections may . . . appeal to the superior court for the judicial district where the land affected is located, and if located in more than one judicial district to the court in any such judicial district. . . . The appeal shall state the reasons upon which it is predicated and shall not stay proceedings on the regulation, order, decision or action, but the court may on application and after notice grant a restraining order. . . ."

this contention, the plaintiff cited to this court's holdings in *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 848 A.2d 395 (2004), and *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 832 A.2d 1 (2003), and General Statutes § 22a-41.[9] In response,

---

[9] General Statutes § 22a-41 provides in relevant part: "(a) In carrying out the purposes and policies of sections 22a-36 to 22a-45a, inclusive . . . the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to:

"(1) The environmental impact of the proposed regulated activity on wetlands or watercourses;

"(2) The applicant's purpose for, and any feasible and prudent alternatives to, the proposed regulated activity which alternatives would cause less or no environmental impact to wetlands or watercourses;

"(3) The relationship between the short-term and long-term impacts of the proposed regulated activity on wetlands or watercourses and the maintenance and enhancement of long-term productivity of such wetlands or watercourses;

"(4) Irreversible and irretrievable loss of wetland or watercourse resources which would be caused by the proposed regulated activity, including the extent to which such activity would foreclose a future ability to protect, enhance or restore such resources, and any mitigation measures which may be considered as a condition of issuing a permit for such activity including, but not limited to, measures to (A) prevent or minimize pollution or other environmental damage, (B) maintain or enhance existing environmental quality, or (C) in the following order of priority: Restore, enhance and create productive wetland or watercourse resources;

"(5) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened by the proposed regulated activity; and

"(6) Impacts of the proposed regulated activity on wetlands or watercourses outside the area for which the activity is proposed and future activities associated with, or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity and which may have an impact on wetlands or watercourses.

"(b) (1) In the case of an application which received a public hearing pursuant to (A) subsection (k) of section 22a-39, or (B) a finding by the inland wetlands agency that the proposed activity may have a significant impact on wetlands or watercourses, a permit shall not be issued unless the commissioner finds on the basis of the record that a feasible and prudent alternative does not exist. In making his finding, the commissioner shall consider the facts and circumstances set forth in subsection (a) of this section. The finding and the reasons therefor shall be stated on the record in writing.

the commission contended that it was entitled to any information it deemed necessary, in accordance with applicable statutes and regulations, to determine whether the proposed activity affected the wetlands, including a wildlife inventory when appropriate and a discussion of alternatives. The intervenors asserted that it was the responsibility of the commission, not the applicant, to determine whether the proposal impacted the wetlands. Finally, the defendant commissioner of environmental protection; see footnote 2 of this opinion; contended that the commission had jurisdiction over "understanding what impact developments will have upon regulated resources in which flora and fauna are found."

The trial court dismissed the appeal on two grounds. First, the trial court determined that substantial evidence existed to show that the plaintiff's application was incomplete and that this was a proper basis on which to deny the application. In support of that conclusion, the trial court determined that the commission was authorized to promulgate "regulations requiring information on flora and fauna in the area, reasonable alternatives to the proposed action and proposals for

"(2) In the case of an application which is denied on the basis of a finding that there may be feasible and prudent alternatives to the proposed regulated activity which have less adverse impact on wetlands or watercourses, the commissioner or the inland wetlands agency, as the case may be, shall propose on the record in writing the types of alternatives which the applicant may investigate provided this subdivision shall not be construed to shift the burden from the applicant to prove that he is entitled to the permit or to present alternatives to the proposed regulated activity.

"(c) For purposes of this section, (1) 'wetlands or watercourses' includes aquatic, plant or animal life and habitats in wetlands or watercourses, and (2) 'habitats' means areas or environments in which an organism or biological population normally lives or occurs.

"(d) A municipal inland wetlands agency shall not deny or condition an application for a regulated activity in an area outside wetlands or watercourses on the basis of an impact or effect on aquatic, plant, or animal life unless such activity will likely impact or affect the physical characteristics of such wetlands or watercourses."

drainage and conservation easements." It also determined that "regulations allow the commission to request this [information] as part of the application 'to permit the [c]ommission to evaluate the development's impact on the regulated area.' " The trial court noted that "the plaintiff's argument assumes that it can dictate to the commission that the development will have no affect on the wetlands; this, however, is the very legal conclusion that only the commission is statutorily empowered to make . . . and for which the commission needs the disputed information." It rejected the plaintiff's claim that this court's holdings in *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 57, and *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, supra, 266 Conn. 150, as well as § 22a-41 (d), barred the commission from requesting the particular information sought and concluded that the commission was entitled to require such information to determine whether the proposed activity would adversely impact the wetlands. Second, the trial court concluded that, although the commission had made no express finding to this effect, there was substantial evidence in the record that the proposed subdivision would adversely affect the wetlands. This appeal followed. Additional facts and procedural history will be provided as necessary.

On appeal, the plaintiff challenges both grounds for the trial court's decision. With respect to the first ground, the plaintiff claims that the trial court improperly concluded that there was substantial evidence to support the commission's decision that the plaintiff's application was incomplete because, by statute, the commission is precluded from demanding specific wildlife information or an analysis of potential impacts on those species when the applicant has established that its proposed activity would cause no changes to the physical characteristics of the wetlands and water-

courses. Consequently, the plaintiff contends that it submitted all of the information required. The plaintiff further contends that, to the extent that the denial on this ground was supported by substantial evidence, the court improperly dismissed the appeal rather than remand the case to the commission so that the plaintiff could provide any additional information required. With respect to the second ground, the plaintiff claims that the trial court improperly expanded the scope of its review by deciding an issue that the commission never reached, that is, whether the wetlands on the property would be impacted adversely by the plaintiff's revised development plan, and improperly determined that substantial evidence supported such a finding. We affirm the judgment of the trial court on the ground that substantial evidence existed to show that the plaintiff's application was incomplete and that this was a proper basis on which to deny the application. We therefore do not reach the plaintiff's claims regarding whether the trial court improperly expanded the scope of its review to affirm the commission's decision on an additional basis.

I

The plaintiff first claims that the trial court improperly concluded that substantial evidence supported the commission's decision that the application for a wetlands permit was incomplete. Specifically, the plaintiff claims that, in the absence of evidence that the proposed activity would either change the physical characteristics of the wetlands or cause an impact on animal species outside the wetlands that, in turn, would result in such a change to the wetlands, § 22a-41 (d) expressly prohibits the commission's denial of wetlands permit applications on the basis of the mere impact or potential impact to animal species. With respect to the first evidentiary deficiency, the plaintiff asserts that, because it had established that its proposed subdivision would

not affect the physical characteristics of the wetlands or watercourses on the property, the commission had no authority to request such information, nor any basis to deny its application for its lack of information. With respect to the second evidentiary deficiency, the plaintiff essentially claims that, because no one had proffered evidence that an impact on wildlife on the property could cause a change to the physical characteristics of the wetlands, it could not be required to produce a wildlife inventory.

The commission responds that the trial court properly concluded that, because the application lacked information necessary for the commission to determine whether there would be an adverse impact to the wetlands, which included information concerning existing wildlife and an analysis of the potential impact on those species, the application was not in substantial compliance with the commission's regulations and, therefore, was incomplete. With respect to the plaintiff's assertion that § 22a-41 (d) prohibits the denial of a wetlands permit application on the basis of impact on wildlife, the commission contends that § 22a-41 (d) is not implicated by its denial. Instead, the commission maintains that it denied the plaintiff's application, not because wildlife would be impacted, but because the commission lacked sufficient information to determine whether the proposed subdivision would adversely impact the wetlands.

The intervenors assert that the plaintiff cannot usurp the function of the commission by refusing to provide information that the commission needs in order to evaluate its application simply because the *plaintiff* has determined that no adverse impact will result. We agree with the legal arguments of the commission and the intervenors and disagree with a fundamental factual premise of the plaintiff's argument. We address each of these points in turn.

A

To determine whether the commission properly could deny the application based on its assessment that it was incomplete, we first must determine whether the commission was entitled to the information that it sought pursuant to the governing statutory scheme. Specifically, because the plaintiff challenges the commission's ability to require the submission of a detailed plant and animal survey for the plaintiff's entire property,[10] whether inside or outside the wetlands, unless there is evidence that the proposed activity will result in a change to the physical characteristics of the wetlands, we begin by examining the relevant statutes to determine whether a commission may require such information for purposes of evaluating a wetlands permit application. This determination involves an issue of statutory construction over which our review is plenary. *Moon* v. *Zoning Board of Appeals*, 291 Conn. 16, 20, 966 A.2d 722 (2009).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering

___

[10] We note that it is not clear from the record whether the inventory sought was intended to cover only the wetlands on the property or the property in its entirety. The plaintiff's argument makes no distinction between plant and animal life within the wetlands or on the property itself, and the documentation submitted by the plaintiff to provide plant and animal information covered the property as a whole. Accordingly, we construe the plaintiff's claim as pertaining to a request by the commission for a plant and animal inventory for the entire property.

such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., 21.

The governing statutory scheme is contained in the act, § 22a-36 et seq. The legislature has set forth a statement of public policy and specific legislative findings recognizing the importance of, and rationale for, "preserv[ing] the wetlands and . . . prevent[ing] the despoliation and destruction thereof" because of the adverse consequences arising from the loss of wetlands resources. General Statutes § 22a-28.[11] The act specifically recognizes that these resources are important, both as "sources of nutrients to finfish, crustacea and shellfish of significant economic value . . . [and as] habitats for plants and animals of significant economic value . . . ." General Statutes § 22a-28. Noting the underlying fragility of wetlands and watercourses resources, the legislature expressly stated that it is "the purpose of [the act] . . . to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and

---

[11] General Statutes § 22a-28 provides: "It is declared that much of the wetlands of this state has been lost or despoiled by unregulated dredging, dumping, filling and like activities and that the remaining wetlands of this state are all in jeopardy of being lost or despoiled by these and other activities, that such loss or despoliation will adversely affect, if not entirely eliminate, the value of such wetlands as sources of nutrients to finfish, crustacea and shellfish of significant economic value; that such loss or despoliation will destroy such wetlands as habitats for plants and animals of significant economic value and will eliminate or substantially reduce marine commerce, recreation and aesthetic enjoyment; and that such loss or despoliation will, in most cases, disturb the natural ability of tidal wetlands to reduce flood damage and adversely affect the public health and welfare; that such loss or despoliation will substantially reduce the capacity of such wetlands to absorb silt and will thus result in the increased silting of channels and harbor areas to the detriment of free navigation. Therefore, it is declared to be the public policy of this state to preserve the wetlands and to prevent the despoliation and destruction thereof."

watercourses by [inter alia] . . . *preventing loss of fish and other beneficial aquatic organisms, wildlife and vegetation and the destruction of the natural habitats thereof . . . .*"[12] (Emphasis added.) General Statutes § 22a-36.

In accordance with this policy and purpose, § 22a-41 (a) sets forth specific criteria that must be considered by a wetlands commission in determining whether an application for a wetlands permit should be granted. See footnote 9 of this opinion. Specifically, a commission is directed to consider: "(1) The *environmental impact* of the proposed regulated activity on wetlands or watercourses; (2) The applicant's purpose for, and any *feasible and prudent alternatives to, the proposed regulated activity* which alternatives would cause less or no environmental impact to wetlands or watercourses; (3) The relationship between the short-term and long-term impacts of the proposed regulated activity on wetlands or watercourses and the *maintenance and enhancement of long-term productivity of such wetlands* or watercourses; (4) *Irreversible and irretrievable loss of wetland or watercourse resources* which would be caused by the proposed regulated activity . . . and any mitigation measures which may be considered as a condition of issuing a permit for such activity including, but not limited to, measures to (A) prevent or minimize pollution or other environmental damage, [or] (B) main-

---

[12] We recognize that in *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission,* supra, 266 Conn. 166–69, this court rejected the contention that the policy statement set forth in § 22a-36 indicated that the legislature intended for plant and wildlife to be protected as part of the act. We did so, however, under the statutory scheme then in existence. As we discuss later in this opinion; see footnote 13 of this opinion; following our decision in *AvalonBay Communities, Inc.,* the legislature amended § 22a-36 to clarify its intent that impact to plants and wildlife in the wetlands is a valid consideration for local inland wetlands commissions. See 47 S. Proc., Pt. 8, 2004 Sess., p. 2376, remarks of Senator Leonard A. Fasano; Conn. Joint Standing Committee Hearings, Environment, Pt. 2, 2004 Sess., pp. 393–94, 462, remarks of Attorney General Richard Blumenthal and Senator John McKinney.

tain or enhance existing environmental quality . . . (6) *Impacts of the proposed regulated activity on wetlands or watercourses outside the area for which the activity is proposed* and future activities associated with, or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity and which may have an impact on wetlands or watercourses." (Emphasis added.) General Statutes § 22a-41 (a).

Although the act sets forth generally applicable definitions for wetlands and watercourses that this court previously has emphasized relate only to the "physical characteristics" of the wetlands and watercourses;[13] *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 68; *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission,*

---

[13] This court had examined the extent of the jurisdiction of inland wetlands commissions under the act in *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 57, and *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission,* supra, 266 Conn. 163. Reviewing the provisions of the act, this court noted that wetlands and watercourses resources were defined by reference to their physical characteristics and, therefore, concluded: "[T]he commission may regulate activities outside of wetlands, watercourses and upland review areas only if those activities are likely to affect the land which comprises a wetland, the body of water that comprises a watercourse or the channel and bank of an intermittent watercourse. . . . We conclude, therefore, that the act protects the physical characteristics of wetlands and watercourses and not the wildlife, including wetland obligate species, or biodiversity." *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission,* supra, 163.

Following this court's decision in *AvalonBay Communities, Inc.,* however, the legislature modified § 22a-41 to address these concerns and clarify its intent to balance the interests of preserving wetlands and watercourses, including the plants and wildlife that are part of the wetlands, with the interests of responsible land use. See 47 S. Proc., Pt. 8, 2004 Sess., p. 2370, remarks of Senator Donald E. Williams, Jr. Subsequently, the legislature enacted Public Acts 2004, No. 04-209, § 1, which added subsections (c) and (d) to § 22a-41 and was intended to establish that "impacts to aquatic, plant or animal life and habitats are legitimately considered by local wetland commissions when such impacts occur in the wetland or watercourses." 47 H.R. Proc., Pt. 17, 2004 Sess., p. 5576, remarks of Representative Patricia M. Widlitz.

supra, 266 Conn. 162–63; see General Statutes § 22a-38 (15) and (16); in 2004, the legislature added subsection (c) to § 22a-41, which contains a more expansive definition of wetlands and watercourses for purposes of the commission's considerations of the factors set forth in that statute for permit approval. Public Acts 2004, No. 04-209, § 1. That subsection provides: "For purposes of this section, (1) 'wetlands or watercourses' includes *aquatic, plant or animal life and habitats in wetlands or watercourses*, and (2) 'habitats' means areas or environments in which an organism or biological population normally lives or occurs." (Emphasis added.) General Statutes § 22a-41 (c).

These provisions make clear that, consistent with the policy and purpose set forth as part of the act, the wetlands resources that a commission is charged with preserving and protecting; General Statutes § 22a-41 (a) (4); General Statutes § 22a-42a (d) (1) (C);[14] are not limited simply to the wetlands and watercourses as containers of soil and water but encompass the aquatic, plant or animal life and habitats that exist therein. Consequently, when a commission evaluates an application for a wetlands permit, it is proper for a commission to consider the factors set forth in § 22a-41 (a) with respect not only to the wetlands and watercourses in relation to their physical characteristics, but also in relation to

---

[14] General Statutes § 22a-42a (d) (1) provides in relevant part: "In granting, denying or limiting any permit for a regulated activity the inland wetlands agency, or its agent, shall consider the factors set forth in section 22a-41, and such agency, or its agent, shall state upon the record the reason for its decision. In granting a permit the inland wetlands agency, or its agent, may grant the application as filed or grant it upon other terms, conditions, limitations or modifications of the regulated activity which are designed to carry out the policy of sections 22a-36 to 22a-45, inclusive. Such terms may include any reasonable measures which would mitigate the impacts of the regulated activity and which would (A) prevent or minimize pollution or other environmental damage, (B) maintain or enhance existing environmental quality, or (C) in the following order of priority: Restore, enhance and create productive wetland or watercourse resources. . . ."

the aquatic, plant and animal life and habitats that are part of those wetlands and watercourses. As part of that evaluation, a commission necessarily must be able to request, and is entitled to, information on the aquatic, plant or animal life and habitats that are part of the wetlands and watercourses, pursuant to § 22a-41 (c), as well as an assessment of impacts to those resources, along with information on any impact to plant or animal life outside the wetlands that might, in turn, impact the wetlands. *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, supra, 266 Conn. 162–63 n.19 (noting that negative impact on wildlife species may have "negative consequential effect on the physical characteristics of a wetland or watercourse"); see also Conn. Joint Standing Committee Hearings, Environment, Pt. 2, 2004 Sess., p. 462, remarks of Senator John McKinney (Noting that inland wetlands commissions may request information on plants and wildlife and impacts on them by the proposed activity because, "if there are impacts to that wildlife that in any way impairs or negatively impacts the wetlands, then it's absolutely within your jurisdiction. It always was, and it always is.").

The plaintiff nonetheless contends that § 22a-41 (d) bars a commission from requesting information on wildlife and impacts thereon from the proposed activity when there is no evidence of a change in the physical characteristics of a wetland. The plaintiff's construction of § 22a-41 (d) presupposes that the commission must establish that the physical characteristics of the wetlands will be impacted before it can request information on wildlife. We disagree for two reasons—the first, for the reasons set forth in the discussion that follows, as a matter of statutory construction, and the second, for the reasons set forth in part I B of this opinion, as a matter of evidence.

Section 22a-41 (d) provides: "A municipal inland wet-lands agency shall not deny or condition an application for a regulated activity in an area outside wetlands or watercourses on the basis of an impact or effect on aquatic, plant, or animal life unless such activity will likely impact or affect the physical characteristics of such wetlands or watercourses." The text of § 22a-41 (d) bars a commission only from *denying or conditioning approval* of a wetlands permit on the basis of the impact to plant and wildlife when there is no impact to the physical characteristics of a wetlands. In the present case, however, the plaintiff's application was not denied on the basis of the impact to wildlife, but because it was incomplete. Indeed, in its reply brief to this court, the plaintiff agreed with the commission that the com-mission never reached the question of whether the wet-lands would be impacted adversely. Nothing in § 22a-41 (d) prohibits a commission from requesting information on wildlife in order to determine *whether* the proposed activity either will "affect the physical characteristics of such wetlands" or will impact wildlife outside the wetlands that in turn will "affect the physical character-istics of such wetlands." Whether the physical charac-teristics of the wetlands are impacted is a factual determination that only the commission is empowered to make and which cannot be reached in the absence of such information.[15] Indeed, the plaintiff's construc-tion of § 22a-41 (d) would effectively read § 22a-41 (c) out of the statute, as it would even eliminate the consid-eration of plant and animal resources within the wet-lands. We conclude, therefore, § 22a-41 (d) is not

---

[15] We recognize that, with respect to requests for inventories of plant and animal species *outside* a regulated area, there may be a situation in which the distance between the regulated area and the areas on the property for which an inventory is requested is so remote and makes it so unlikely that the activity could have any effect on the wetlands that it would be arbitrary and capricious for the commission to impose such a demand on an applicant. The evidence in the present case, however, does not implicate such concerns.

implicated by this appeal, and we reject the plaintiff's claim.

We also reject the plaintiff's contention that it could not be required to produce a wildlife inventory unless someone first had proffered evidence that would show that an impact on the wildlife in turn could cause a change to the physical characteristics of the wetlands. The plaintiff improperly shifts the burden of providing information to support its application from the applicant to the commission itself and places the commission in the role of disproving the plaintiff's assertion, rather than evaluating information presented to it in accordance with the governing statutory and regulatory scheme. Cf. *Queach Corp.* v. *Inland Wetlands Commission*, 258 Conn. 178, 202–203, 779 A.2d 134 (2001) (Noting that a wetlands commission may request information authorized in § 22a-41 and stating that, "[i]f the applicant were allowed to determine whether the activity does not intrude on or affect the resources, the issue likely would not come before the commission for consideration. We do not believe that the legislature envisioned such an approach."). The plaintiff puts the cart before the horse, so to speak, by assuming that the causal connection to a change to the physical characteristics of the wetlands must precede a wildlife inventory. Indeed, the commission or an interested third party may use a wildlife inventory that an applicant submits as a basis for studying *whether* the proposed activity will impact that wildlife and *whether* that impact will in turn change the physical characteristics of the wetlands. Therefore, we conclude that the commission was authorized by the governing statutory scheme to request this information.

B

Having established that the commission was authorized to request information on wildlife and the impacts

of the proposed subdivision on those species, we turn next to the plaintiff's contention that the trial court improperly determined that there was substantial evidence to support the commission's finding that the application was incomplete. We disagree with this contention for two reasons. First, the plaintiff assumes an improper factual predicate regarding the evidence, namely, that the plaintiff had established that its plan would have no effect on the physical characteristics of the wetlands and, therefore, the information sought could not be relevant. Second, there was substantial evidence that the information that the plaintiff did produce was inadequate for the commission to determine whether there would be an adverse impact to the wetlands.

It is well established that in challenging the decision of an administrative agency, such as an inland wetlands commission, the plaintiff carries the burden of proof to show that the challenged action is not supported by the record. *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 587, 628 A.2d 1286 (1993). "The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . .

"In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard

applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [This requires] something less than the weight of the evidence . . . . The reviewing court must take into account [that there may be] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Citations omitted; internal quotation marks omitted.) Id., 587–88; accord *Finley* v. *Inland Wetlands Commission,* 289 Conn. 12, 37–38, 959 A.2d 569 (2008).

Finally, the commission "is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 542, 525 A.2d 940 (1987). "Whether the substantial evidence test was applied properly by the trial court in its review of the [agency's] decision is a question of law over which our review is plenary." *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 70.

The record reflects the following additional undisputed facts and procedural history that are relevant to the resolution of this issue. The commission heard conflicting evidence on the plaintiff's application over the course of the public hearing. At the first session of the public hearing, the plaintiff's attorney read a letter into the record from its expert, Cole, to respond to the concerns of the conservation district that the buffer area around the vernal pools needed to be increased to protect the function of the pools and that the water supply to the wetlands would be compromised because

surface runoff would be redirected away from the wet-
lands by the proposed roadway and other structures.
In his letter, Cole reiterated that there were no proposed
activities within any wetland area on the property,
noted that the act does not require additional protective
measures to be implemented near the vernal pools,
disagreed that the redirection of stormwater discharge
away from the wetlands would compromise the water
supply to the wetlands, and concluded again that the
proposed activities would not significantly alter or nega-
tively impact the wetlands. The intervenors rebutted
this conclusion with the testimony and report of George
Logan, a soil scientist who had reviewed the plaintiff's
application. Logan concluded that the proposed subdi-
vision had the potential to impact the wetlands
adversely but that the application lacked certain data
necessary to determine the extent of that impact,
including "specific inventories and characterizations of
[the vernal pool wetlands], their hydrology, their flora
and fauna and . . . amphibian surveys," a "water bud-
get" to evaluate water flow into the wetlands, and an
analysis of whether the discharge from the proposed
septic systems would affect the wetlands.[16]

At some time before the next session of the public
hearing, some commission members and experts for
the plaintiff and intervenors conducted a site walk at the
property. At that next session, the plaintiff responded to
Logan's concern about the lack of data relating to the
water levels through testimony from Scott Young, a
licensed engineer. Young indicated that the proposed
subdivision would result in a *three inch drop* in the
amount of water feeding the vernal pool wetlands on

---

[16] In addition to the reasons we have cited in the text of this opinion, Logan
also noted that the application lacked: (1) detail as to the characteristics of
the five distinct wetland areas on the property, which had been presented
in the application in the aggregate; and (2) an analysis of alternative measures
to mitigate any potential impact to the wetlands.

the property, which was *equivalent to 10,000 gallons or "the amount of water from a small swimming pool . . . that is [three] or [four] feet deep."* (Emphasis added.) Cole then responded on behalf of the plaintiff, asserting that, despite this deficit, there would be no impact on the physical characteristics of the wetlands.

Relying on the reports of the intervenors and the conservation district, Commissioner Taylor asked for alternatives to the proposed development to avoid having the proposed roadway divert the water supply from the vernal pools. Cole responded that, because, in his opinion, there would be no impact to the wetlands, the plaintiff was not required to submit alternatives. Taylor also asked whether an inventory of existing wildlife and plant life on the property had been performed. Cole responded that they had performed a site walk and "inspected the site for the physical wetland characteristics, the function and values of those wetland characteristics, and we provided that information in our application." The application did not, however, contain an inventory of actual plant life and wildlife.

At that same session of the public hearing, the intervenors submitted a second report from Logan in which, on the basis of information gained from a site walk, he provided more detailed information than his initial report to contradict the plaintiff's modifications and conclusions. Among the findings that Logan's second report highlighted were the facts that the water supply to the vernal pools, which were "hydrologically vulnerable," with sufficient existing water but no water to spare, would be reduced by approximately one third and that specific topography and wildlife information for the wetlands had not been provided.[17] In summary,

---

[17] Logan also concluded that: (1) discharge from the septic systems, though meeting public health standards, could affect the vernal pools significantly by causing "algal blooms" and rendering the pools "anoxic"; (2) certain of the wetlands were "sensitive to sedimentation, direct stormwater discharge, and to effluent from upgradient septic systems"; and (3) the proposed

he concluded: "[T]here will be an adverse significant impact on these resources with this development as proposed today. Reasonable and prudent alternatives do exist; they haven't explored them. . . . [The commission does not] have the information that [it needs] in order to make a good decision."

At the third session of the public hearing, the plaintiff presented another modification to the proposed subdivision, including the addition of a stormwater basin that would discharge filtered stormwater from the development directly into the wetlands to replenish them, resulting in no loss in the net volume of water feeding the wetlands. The plaintiff also asserted that it "has carefully designed its plan and has made modifications in the course of the hearing to avoid physical impacts to inland wetlands and watercourses . . . . [S]ince the . . . plan avoid[s] physical impacts to the wetlands, we believe that a detailed analysis of all species on the property is not necessary."

Recognizing that it had been presented with conflicting information, the commission sent the revised application to an engineering firm, Fuss & O'Neill, Inc. (Fuss & O'Neill), for its independent review. Fuss & O'Neill reviewed the application for compliance with the commission's regulations and submitted a report to the commission that identified a number of deficiencies in the application. In particular, the Fuss & O'Neil report noted that, although "[p]lant types were briefly described for the wetland areas as part of the wetland evaluation report, [no] animal species were provided for the wetland areas . . . ." The report also identified deficiencies in the drainage information provided and stated that certain wetlands would receive different

stormwater basins would discharge into two wetland ponds located off of the property, and no analysis had been done to determine if the resultant discharge would affect the off-site pools.

amounts of water as a result of the proposed development than they would have received in the absence of the proposed development. Fuss & O'Neill recommended, inter alia, that the applicant provide "plant and animal habitat information and evaluation of impact," along with additional details in a variety of areas.

At the final session of the public hearing, the plaintiff presented modifications to its application in an effort to address certain concerns raised in the Fuss & O'Neill report. In particular, the plaintiff submitted a wildlife and plant life inventory that it described as showing "the extent and inventories of the vegetation and wildlife species utilizing the site which are either likely known to occur or have a high likelihood expected to be noted on the site." It also submitted a drainage report that indicated that the proposed development would result in additional drainage away from the property, concluding that these changes would not adversely affect abutting properties. The plaintiff also submitted an analysis of stormwater discharge into the natural wetlands and noted that any discharge would be treated to remove sediment. Cole also testified for the plaintiff that, although one of the wetland areas would receive additional water as a result of the development, that increase would not have "a significant or adverse impact due to the fact that it is a large wetland system . . . extend[ing] for several thousand feet to the south . . . ."

Logan then testified for the intervenors to rebut the plaintiff's modifications, opining that, because the plaintiff's wildlife and plant life inventory listed only general information on types of plants and wildlife found in the area, without providing information specific to each wetland resource, it was not sufficient to evaluate the effect on the wetlands. He explained that an analysis of how the plants and wildlife were keyed to each wetland resource was necessary because each wetland had dif-

ferent hydrologic characteristics and sensitivities. He concluded that, because the inventory lacked "information on the diversity structure and density of these species that are keyed specifically to each of [the] wetlands," the information provided had limited usefulness.

Commissioner Taylor again questioned the plaintiff about providing an analysis of alternatives to the proposed plan, noting that three separate reports indicated that the proposed subdivision would have a significant impact to the wetlands, but the plaintiff responded that alternatives were required only if there would be a physical impact to the wetlands and that the plan had been designed so that the wetlands would suffer no adverse effects. The commission's chairman, Bruce Fitzback, offered several suggestions for modifying the plan to address certain concerns raised in the public hearing, to which the plaintiff orally agreed, and suggested that, following the close of the public hearing, the commission could take public comment by way of correspondence, but it was determined that this procedure would be improper. The plaintiff had no further comment, and, thereafter, the public hearing was closed.

Following the close of the public hearing, the commission denied, without prejudice, the application as incomplete for, inter alia, the following reasons: (1) the wildlife inventory was nonspecific; (2) the application did not contain information concerning alternatives that might address some of the issues that had been raised throughout the public hearing; and (3) essential information was missing from the plans for the proposed development, including drainage easements.[18]

---

[18] Taylor moved for the denial as incomplete using the following language: "I make a motion to deny the application as incomplete. The wildlife inventory that they gave us, I believe, is nonspecific; it is not sufficient. They have not offered us any alternatives to their plans that might remediate some of the problems that we have seen. The set of plans that they presented are missing vital pieces of information, such as easements for the drainage fallouts that they have called for. There are certain things that should be

In light of this record, the trial court properly concluded that the commission's decision was supported by substantial evidence. At the outset, it is clear that the plaintiff's contention that no evidence was presented that there would be a change in the physical characteristics of the wetlands is not supported by the record. Throughout the course of the public hearing, evidence clearly demonstrated that the wetlands would be impacted in a variety of ways, and the commission needed to resolve whether that impact would be adverse. Significantly, the plaintiff's own expert testified that the natural waterflow to the vernal pools would be interrupted by the proposed roadway and that the wetlands would be replenished by stormwater from the development that had been filtered to public health standards. Experts retained both by the intervenors and by the commission noted that, due to the fact that the vernal pools were highly productive, they were "hydrologically vulnerable" to changes in their water supply. Logan noted that, although the water would be filtered to public health standards, these standards allowed the presence of nitrate-nitrogen levels at amounts that would impact the wetlands and watercourses adversely, and, moreover, that the southern wetlands were sensitive to sedimentation and to infiltration from septic systems.

The plaintiff improperly appears to have conflated two distinct inquiries, namely, (1) whether the proposed activity will result in a *change* to the physical characteristics of the wetlands, pursuant to § 22a-41 (d), and (2) whether such change *adversely* will impact the wetlands. Although Cole, the plaintiff's expert, concluded

addressed, such as conservation easements and, more specifically, discharge and flow rate calculations that need to be changed to reduce any runoff or at least zero out any runoff from the property onto other properties. On the basis of that, I would like to make a motion [to] deny [the application] without prejudice."

that the changes in the water source feeding the wetlands would not result in an adverse impact, there cannot be any serious dispute that the interruption of the wetlands' water source and the replacement with water from a different source is a change to the physical characteristics of the wetlands that the commission was allowed, indeed required, to evaluate. The plaintiff's own evidence clearly established that the proposed development would result in a change to the physical characteristics of the wetlands. Clearly, evidence of changes to the water quality constitutes a change to the physical characteristics of the wetlands, but such a change may or may not have an adverse effect on the wetlands.

In light of this conclusion, we turn to the deficiencies identified in the board's decision. As is well settled, the board's decision must be affirmed if there is any ground to support it. *Samperi* v. *Inland Wetlands Agency*, supra, 226 Conn. 587–88; accord *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 37–39. In the present case, at least two of the reasons cited by the commission for concluding that the application was incomplete are supported by substantial evidence, namely, that the application lacked: (1) a specific wildlife inventory and an analysis of the impact of the proposed subdivision on that wildlife; and (2) an analysis of alternatives to the proposed development to address issues that had been raised. With respect to the first reason, as we previously have noted, the town's regulations specify that applications must contain "*a sufficiently detailed description of the proposed activity to permit the [c]ommission to evaluate its impact on the regulated area*" and note that applicants may be required to produce an inventory of plant and animal species on the property and the effects of the proposed activity on those species. (Emphasis added.) Putnam Wetlands and

Water Courses Regs., § 6.1.[19] In the present case, although on the last day of the public hearing, the plaintiff provided a list of vegetation and wildlife that was either known to be present or likely to be present, there was testimony that this inventory lacked the requisite specificity for the commission to determine whether the wetlands would be impacted. As Logan, the intervenors' expert, noted, the lists of plants and wildlife were not specific to any of the five wetlands, making it impossible to determine whether some, all or none of the species listed are associated with any particular wetland. Moreover, the wildlife inventory does not indicate whether the wildlife is found only in the upland, off wetlands area, individual wetlands or both. Because of the varying degree of hydrological characteristics and sensitivities of the different wetlands, Logan stated it would not be possible to determine whether these species would be impacted by the proposed development without information specific to each wetland. Finally, the appli-

---

[19] Section 6.1 of the Putnam wetlands and water courses regulations provides: "Each application for a permit, not permitted in Section 3.0, shall be accompanied by a sufficiently detailed description of the proposed activity to permit the [c]ommission to evaluate its impact on the regulated area. The description may be required to include, but not be limited to, information such as the following:

"6.1.1 The purpose of the activity.

"6.1.2 The amount and precise nature of material to be deposited or extracted.

"6.1.3 The types and extent of plant and animal species on the property and the probable affect of the proposed activity on these species.

"6.1.4 The present character of any water course and probable affect of the proposed activity on it. If pollution is proposed, a chemical analysis of the pollutant and its probable affects on the plant and animal life in the affected area.

"6.1.5 Blueprints, engineering drawings or architectu[r]al plans or designs, where available, of any proposed construction on the property.

"6.1.6 Proposed measures to be taken to minimize or avoid any adverse impact on the regulated area, appropriate erosion and sediment control measures which may include but are not limited to silt fences, hay bales, diversions, etc. to protect a wetland down-slope.

"6.1.7 Reason or reasons why applicant feels it is necessary to place regulated use on this protected wetland."

cation contains no analysis of the effects of the proposed subdivision on any of the species other than the conclusory statement of the plaintiff's expert, unsupported by analysis, that there would be no adverse effect. It is well established that credibility and factual determinations are solely within the province of the commission; *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 38; and the commission "is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 542.

With respect to whether the application lacked an analysis of alternatives to the proposed subdivision, it is undisputed that the plaintiff consistently failed to provide an analysis of alternatives, maintaining that, because there would be no adverse affect on the wetlands, no alternatives analysis was necessary. It is well established, however, that a commission is authorized to request information concerning alternatives to the proposed activity and, significantly, such information permits the commission "to determine the likelihood that the proposed activity may or may not impact or affect the resource, and whether an alternative exists to lessen such impact." *Queach Corp.* v. *Inland Wetlands Commission*, supra, 258 Conn. 203. Moreover, as we previously have noted, the evidence clearly established that the plaintiff's plan would result in a physical change to the wetlands.

It is clear that the commission was acting pursuant to its regulations when it requested a wildlife inventory and an alternatives analysis, and those regulations do not condition receipt of such information on a finding of an adverse impact to the wetlands. The plaintiff has made no challenge to those regulations. Therefore, in light of the evidence contained in the record, we con-

clude that the trial court properly determined that substantial evidence supported the commission's determination that the application was incomplete.

## II

The plaintiff next contends that the trial court improperly dismissed the appeal, rather than remanding the matter to the commission so that the plaintiff could submit any additional information required. Specifically, the plaintiff claims that the commission did not request the additional information until after the close of the public hearing, and that issues of due process and fundamental fairness mandate that the plaintiff be given the opportunity to respond to the commission's requests.[20] We are not persuaded.

"Although proceedings before administrative agencies such as . . . [inland wetlands] commissions are informal and are conducted without regard to the strict rules of evidence, the hearings must be conducted so as not to violate the fundamental rules of natural justice. *Pizzola* v. *Planning & Zoning Commission*, 167 Conn. 202, 207, 355 A.2d 21 (1974). Due process of law requires not only that there be due notice of the hearing but that at the hearing the parties involved have a right to

[20] We construe the plaintiff's due process claim consistently with the manner in which it was presented, namely, that the commission denied the plaintiff's application as incomplete in violation of its due process rights because the commission allegedly waited until after the close of the public hearing to request the additional information. To the extent that the plaintiff, by its talismanic invocation of "due process," is attempting to raise any other claim, we are unable to ascertain what that claim might be. We therefore consider any other such claim to be inadequately briefed, and we decline to review it. See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." [Internal quotation marks omitted.]).

produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence. Id.; *Welch* v. *Zoning Board of Appeals*, 158 Conn. 208, 212–13, 257 A.2d 795 (1969)." *Connecticut Fund for the Environment, Inc.* v. *Stamford*, 192 Conn. 247, 249, 470 A.2d 1214 (1984).

Our review of the record clearly indicates that, throughout the course of the public hearing, the plaintiff was afforded the right to produce relevant evidence and, indeed, that the plaintiff expressly was asked to address concerns raised at the public hearing. Specifically, at the second session of the public hearing, Taylor requested the plaintiff to provide an analysis of alternatives to the proposed development and asked whether an inventory of plant life and wildlife had been performed. At the final session of the public hearing, Taylor again questioned the plaintiff about providing an alternatives analysis. At each session of the public hearing, the intervenors and experts other than Cole noted expressly that the wetlands on the property had different characteristics, and that specific information concerning soil composition and plant and animal characteristics for each wetland was required to determine whether the wetlands resources would be impacted. Moreover, the report prepared by Fuss & O'Neill at the request of the commission prior to the final session of the public hearing expressly noted, inter alia, that a wildlife inventory for the wetlands areas—the "types and extent of plant and animal species," the probable effect of the proposed activity on the wetlands species, and specific information concerning drainage both on and off-site all were missing from the application. The record thus indicates that the plaintiff was on notice that its application was deficient, as identified both by the commission and its expert, along with the testimony presented by the intervenors. Until the final

day of the public hearing, however, the plaintiff, in the mistaken belief that its determination that the proposed subdivision did not affect the wetlands was dispositive, repeatedly informed the commission that it was not required to, and therefore would not, provide the requested information.[21]

The plaintiff cites several cases to support the proposition that a remand is the appropriate remedy to allow it to present the requested information. These cases are inapposite because they concerned requests for either information for which the applicant had no notice or information that in fact had been provided, but not in conformity with established procedures. In the present case, however, the plaintiff had ample notice that its application was being challenged as deficient and that the commission questioned whether it could make the necessary determination without additional specified information. Despite having every opportunity to provide the information requested, the plaintiff chose to rely on its own interpretation that, under the statutory scheme, no additional information was required. Indeed, when the plaintiff finally provided some information to the commission, it expressly noted that the information was "not . . . exhaustive."[22] The plaintiff

---

[21] We note that the plaintiff maintained that it was not required to present the requested information even up to the final day of the public hearing. The inventory submitted by the plaintiff at the final session of the public hearing expressly notes in a footnote that "[a]s a result of changes in the . . . act after the Putnam [r]egulations were adopted, a wetlands commission has very limited authority to consider impacts on plant or animal species when reviewing a wetlands application. . . . Although we believe the act does not allow denial of the application based on possible impacts to species on the site, this additional information is being provided in response to the request of the [c]ommission's civil engineer."

[22] The inventory provided by the plaintiff on the final session of the public hearing noted that it had been compiled from "site reconnaissances [conducted] from . . . April 2006 through October 2006." It further qualified the inventory by stating that it had reviewed state wildlife maps and provided information on wildlife species that were "known or *expected to use* the subject site based on direct observations and available habitat." (Emphasis added.) Finally, with respect to the wildlife inventory, the plaintiff expressly

cannot claim that the deficiencies identified by the commission when voting to deny the application had not been communicated until after the close of the public hearing in an attempt to have the court cure the plaintiff of its strategic misstep. Accordingly, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

noted that "this list is relatively small and should not be considered exhaustive." Taken together, it is apparent that additional information exists and was not provided to the commission in this report.