AVALONBAY COMMUNITIES, INC. *v.* INLAND
WETLANDS AND WATERCOURSES AGENCY
OF THE TOWN OF STRATFORD
(AC 31937)

DiPentima, C. J., and Gruendel and Alvord, Js.

---

Argued March 7—officially released July 12, 2011

Conn. App. 97, 102, 891 A.2d 83, cert. denied, 278 Conn. 905, 896 A.2d
107 (2006).

*Brian M. Stone*, for the appellant (defendant).

*Timothy S. Hollister*, with whom were *Gian-Matthew Ranelli* and, on the brief, *Allison M. McKeen*, for the appellee (plaintiff).

*Kevin C. Kelly*, with whom, on the brief, was *Carmine Perri*, for the environmental intervenor.

*Opinion*

ALVORD, J. The defendant, the inland wetlands and watercourses agency of the town of Stratford, appeals from the judgment of the trial court reversing its decision to deny an application for a permit to conduct regulated activities filed by the plaintiff, AvalonBay Communities, Inc. On appeal, the defendant claims that the court did not properly apply the substantial evidence test in its review of the reasons given by the defendant for denying the plaintiff's application and that the court improperly ordered the defendant to issue the wetlands permit rather than simply sustaining the plaintiff's administrative appeal. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history of this case. In September, 2000, the plaintiff filed an application for a wetlands permit (initial application) with the defendant in connection with its proposal to construct an apartment complex that contained units set aside for low and moderate income housing. To that end, the plaintiff also filed its initial affordable housing application with the town's zoning commission

for an amendment to the zoning regulations, a zone change for the proposed development and approval of a site development plan. The defendant and the zoning commission denied both initial applications. In May, 2001, the plaintiff filed a revised application[1] with the defendant and resubmitted its site plan to the zoning commission. Both the defendant and the zoning commission denied the plaintiff's revised applications. The plaintiff appealed from each entity's decision on the revised applications to the Superior Court.

After the appeals had been pending for more than a year, the town of Stratford (town) through its town council filed in each case a verified pleading pursuant to General Statutes § 22a-19, the citizen intervention provision of the Environmental Protection Act of 1971 (act), General Statutes § 22a-14 et seq., claiming that the proposed development would have a negative impact on the environment. The plaintiff filed motions to strike the town's petitions for intervention in both cases, which motions were granted by the court. The town appealed to the Appellate Court from both decisions.

On January 11, 2005, while the town's appeals of the judgments granting the motions to strike were pending before this court, the administrative appeal from the defendant's decision in this case proceeded to judgment on the merits.[2] In its memorandum of decision, the

[1] The revised application is for 12.2 acres of property located at 1600 Cutspring Road and 140 Circle Drive in Stratford. Regulated wetlands and watercourses on the property, consisting of Pumpkin Ground Brook and its four adjacent wetland areas, total 1.37 acres. The 12.2 acre property is part of a 3200 acre watershed and is located at the bottom of that watershed. In addition to the on-site wetland areas, there also is a "pocket" off-site wetland area of 360 square feet located on the property of 152 Circle Drive. The proposed development consists of 146 apartments, some of which are reserved for low and moderate income families.

[2] On February 22, 2005, this court released the decision in *AvalonBay Communities, Inc.* v. *Zoning Commission*, 87 Conn. App. 537, 867 A.2d 37 (2005), aff'd, 280 Conn. 405, 908 A.2d 1033 (2006), in which we concluded that the trial court improperly granted the plaintiff's motions to strike the town's requests to intervene in the wetlands and zoning proceedings. That

court determined that the four reasons set forth by the defendant in its written decision were not legally sufficient to deny the plaintiff's application for the wetlands permit. Citing *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 848 A.2d 395 (2004), the court concluded that the proffered reasons did not rise above speculation or general concerns and that the defendant's determination that the plaintiff's proposed activities would adversely impact wetlands or watercourses was not supported by substantial evidence in the record. Accordingly, the court reversed the defendant's decision and remanded the matter to the defendant " 'for further consideration of any conditions that should be attached to the issuance of the permit as supported by

---

decision, which was affirmed by our Supreme Court; *AvalonBay Communities, Inc.* v. *Zoning Commission*, 280 Conn. 405, 908 A.2d 1033 (2006); allowed the town to intervene in these proceedings. Because the trial court already had rendered judgment in this matter on January 11, 2005, the town has participated as a party in appellate proceedings only.

For that reason, the town's issue in this appeal, as an intervenor pursuant to § 22a-19, merits little discussion. The town claims that the trial court improperly failed to find that feasible and prudent alternatives existed that would protect Pumpkin Ground Brook and its associated wetland areas. It argues that such a finding, made pursuant to § 22a-19 (b) of the act, would have precluded the plaintiff's proposed activities. The town, however, chose not to intervene during the permit proceedings before the defendant, and the defendant, therefore, made no findings with respect to § 22a-19 environmental issues. Id., 409–10. Furthermore, the town was not a party during the trial court proceedings or at the time judgment was rendered, because its appeal from the trial court's granting of the plaintiff's motion to strike the town's request for intervenor status was still pending before this court. In other words, § 22a-19 environmental issues were not before the trial court, and it clearly cannot be faulted for its failure to consider issues that were never presented.

"Intervention allows one who was not a party in an original action to become a party upon his request. He has a derivative role by virtue of an action already shaped by the original parties. He takes the controversy as he finds it and may not introduce his own claims to restyle the action." (Internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 154, 788 A.2d 1158 (2002).

evidence in the present record.' "[3] The defendant filed the present appeal after this court granted its petition for certification to appeal.[4]

I

On appeal, we first address the defendant's claims that the court improperly determined that there was not substantial evidence in the record to support its denial of the plaintiff's application on the grounds that (1) the wetlands and watercourses would be negatively impacted by the sediment and siltation that would enter as a result of the plaintiff's activities, (2) wetland area no. 4 would be negatively impacted by changes to the hydrology of the site, (3) there would be a total loss of the pocket wetland[5] located in the area of the plaintiff's

[3] Because the trial court's remand order directs the defendant to approve the plaintiff's application with conditions only as supported by the present record, and does not require the defendant to make further evidentiary determinations, we conclude that the defendant has appealed from a final judgment. See *Barry* v. *Historic District Commission*, 108 Conn. App. 682, 700, 950 A.2d 1, cert. denied, 289 Conn. 942, 943, 959 A.2d 1008 (2008).

[4] On November 21, 2005, the Supreme Court transferred this appeal to itself pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). The Supreme Court stayed this appeal until a final decision was issued in the proceedings on remand to the zoning commission with respect to the plaintiff's affordable housing application. On August 13, 2009, the trial court, *Cohn, J.*, concluded that the zoning commission's denial based on its concern regarding pollution of the wetlands was not supported by the record but that its concern regarding emergency access to the proposed development was a sufficient reason for its denial of the application. Accordingly, the court dismissed the plaintiff's zoning appeal. The plaintiff filed a petition for certification to appeal with this court, and the zoning commission and the town filed cross petitions. We granted the petitions of all three parties (AC 31982 and AC 31983). On March 3, 2010, the Supreme Court terminated the stay in this matter and transferred the appeal to this court. We heard oral argument on all three appeals on March 7, 2011, and our decision in the zoning appeals was released on the same date as this opinion. See *AvalonBay Communities, Inc.* v. *Zoning Commission*, 130 Conn. App. 36, 21 A.3d 926 (2011).

[5] The area referred to as the pocket wetland by the parties and the court, which was located off the site on the property of 152 Circle Drive, which is adjacent to the proposed emergency access at 140 Circle Drive, consisted of a man-made berm and drainage ditch measuring 360 square feet.

proposed emergency access due to changes in the surface and groundwater flow at the site and (4) the wetlands area adjacent to Pumpkin Ground Brook would be negatively impacted by acid generation from the rock exposed by blasting at the site.

Whether the substantial evidence test was applied properly by the trial court in its review of an inland wetlands agency's decision is a question of law over which our review is plenary. *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 70. "[T]he reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . . *Evidence of general environmental impacts, mere speculation, or general concerns do not qualify as substantial evidence.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 70–71.

"The sine qua non of review of inland wetlands applications is a determination whether the proposed activity will cause an *adverse impact* to a wetland or watercourse." (Emphasis in original.) Id., 74. We keep these constraints in mind in our analysis of the trial

court's application of the substantial evidence test in the present case.

A

One of the reasons given by the defendant for denying the application was "the significant likelihood of construction phase and post-development erosion and sedimentation of materials into both the regulated setback, the wetlands and Pumpkin Ground Brook." The defendant found that "the erosion control measures proposed to be employed by the [plaintiff] during the construction phase would not protect the setback area and wetlands from sediment and siltation. . . . [D]ue to the steep slopes, the nature of the soils, the proximity to the wetlands, and our own experience with failures of what have been 'state of the art' erosion and sediment control plans . . . there is a significant likelihood of sedimentation during construction flowing into the wetlands and Pumpkin Ground Brook, especially given the plan to perform the construction without staged excavations and stabilizations."

In its memorandum of decision, the court first noted that none of the plaintiff's activities will take place in the brook or any of its wetlands or within the regulated seventy-five foot upland review area.[6] As the court properly recognized, however, an inland wetlands agency has statutory authority to regulate activities "around wetlands or watercourses" if those activities "are likely

---

[6] The court noted one exception, which was the plaintiff's proposal to site an emergency access route within the seventy-five foot upland review area of the 360 square foot pocket wetland located next to 140 Circle Drive. See footnote 5 of this opinion.

An upland review area is an area outside of the wetlands and watercourses within which an inland wetlands agency may regulate activities that are likely to affect the wetlands or watercourses. According to the defendant's regulations, the regulated setback area in effect at the time of the plaintiff's application was seventy-five feet. See Stratford Inland Wetlands and Watercourses Regs., §§ 2.26 and 2.27.

to impact or affect wetlands or watercourses." (Internal quotation marks omitted.) See General Statutes § 22a-42a (f).

In reviewing this ground for denial of the permit, the court agreed with the defendant that the record supports a finding that some sediment and siltation will enter the brook and its associated wetlands despite the use of the control measures proposed by the plaintiff. Nevertheless, the court stated that the defendant "never moved beyond speculation in order to establish the volume of such infiltration either during construction or postconstruction or, more importantly, the adverse effects of infiltration. . . . Here, there is neither quantitative evidence of what the volume of flow would be into the wetlands and watercourse nor qualitative evidence of any adverse effects of the flow."[7]

At oral argument before this court, the defendant conceded that the record did not contain substantial evidence for this stated reason for denial if the fact of the entry itself does not constitute an adverse impact.[8] Our review of the record likewise confirms that there

---

[7] The court also discussed the extensive modifications made by the plaintiff to its erosion control plan in response to the defendant's concerns. For example, building sites were moved, an additional line of sediment filter fence was added and numerous structural and nonstructural measures were put in place to eliminate or reduce contamination of the wetlands and watercourse by silt and sediment. The court referred to the 136 page environmental assessment report, with appendix, submitted as part of the plaintiff's revised application.

[8] The defendant claims that the case of *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 525 A.2d 940 (1987), supports its position that the flow of any amount of sediment or siltation into a wetlands or watercourse automatically would be deemed to be an adverse impact. We do not read *Huck* so broadly. In that case, the subject lot area measured 2.691 acres, but only .484 acres was dry land. Id., 540 n.11. As a reason for denial, the agency in *Huck* referred to "[s]*evere* sedimentation, erosion and downstream siltation into Frye Lake . . . ." (Emphasis added.) Id., 542. The mere entry of sediment into the lake was not the reason for the denial, it was the severity of the problem that was given as a ground for the denial.

is no evidence as to the amount of sediment and siltation that would enter or the harm to the wetlands or watercourse that would result from that amount, due to the plaintiff's activities at the site. Given the record before the defendant, we conclude that the concern regarding potential pollution from sediment and siltation does not rise above speculation.[9] Accordingly, the record does not contain substantial evidence because there is "no specific finding of any actual adverse impact to any wetlands or watercourses." *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 77. The defendant could not simply assume that the entry of sediment and siltation would adversely affect the wetlands and watercourse without evidence that it would in fact do so. See id., 81.

## B

The second reason given by the defendant for denying the application was that "the proposed intense development of the site will clearly alter the hydrologic regime[10] of the wetlands. The increase in total runoff, the removal of overburden, the creation of impervious surface will change the ratio of groundwater to surface flow and will, therefore, impact the hydrological regime of the wetlands. We concur with . . . Steven Danzer's[11]

---

[9] "[A]n impact on the wetlands that is speculative or not adverse is insufficient grounds for denial of a wetlands application. . . . [O]ur prior case law [does] not authorize the denial of a wetlands application due to uncertainty as to the impact of a proposed activity on wetlands and watercourses." *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 79 n.28.

[10] "Hydrology" is defined as "a science dealing with the properties, distribution, and circulation of water on and below the earth's surface and in the atmosphere." Merriam-Webster's Collegiate Dictionary (11th Ed. 2005). In its memorandum of decision, the court noted: "By 'hydrologic regime' the [defendant] apparently means the amount, direction and rate of flow of surface and ground water through the property and into the wetlands and the brook."

[11] Steven J. Danzer was the defendant's consulting biologist and environmental planner.

assessment that the rapid assessment field determination used by George T. Logan[12] is not adequate to determine the hydrologic impact, and that longer term and empirical data should have been obtained. . . . This will result in irreversible damage to the wetlands on the site by disruption of the delicate homeostatic balance which has established the existing insect, vegetative and animal life which exists and thrives within this wetland ecosystem."[13]

In reviewing this ground for denial of the permit, the court acknowledged that Danzer, Penelope C. Sharp[14] and Roman S. Mrozinski[15] expressed concerns about siting a multi-building,[16] multi-apartment complex on land adjacent to the brook and its wetland areas. In particular, Danzer opined that additional information was important "to guarantee that the wetland complex will continue to receive an adequate level of deep groundwater recharge during the times critical to maintaining its ecology and hydrological function." Basically, his concern was that the wetland would be "starved over the long term."

From its review of the record, the court determined that the concerns expressed by the consultants and witnesses amounted to no more than the type of general concerns and speculation that our Supreme Court held did not qualify as substantial evidence. See *River Bend*

[12] George T. Logan is a certified wildlife biologist and registered soil scientist. His associate, Sigrun N. Gadwa, is a plant biologist.

[13] The defendant has limited its argument to a claimed negative impact to wetland area no. 4. The trial court noted in its memorandum of decision: "At the hearing on this appeal, counsel for the [defendant] acknowledged that, besides the 'pocket' wetland adjacent to 140 Circle Drive, only one wetland area, wetland area no. 4, was claimed by the [defendant] to be subject to pollution as a result of the proposed development."

[14] Penelope C. Sharp was an environmental consultant for the town.

[15] Roman S. Mrozinski was the executive director of the Fairfield County Soil and Water Conservation District.

[16] The proposed development contains five apartment buildings.

*Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 71. The court indicated that it found no evidence in the record to support the defendant's "sweeping conclusion of irreversible damage to the wetlands." (Internal quotation marks omitted.) To the contrary, the plaintiff's environmental assessment report provided "a detailed description of the existing conditions through a discussion of the functions and values of the wetlands on the property and considered both direct and indirect impacts on wetlands and watercourses, including potential hydrologic impacts. It concluded that such impacts would be 'negligible.'"

The court recognized that the defendant was not obligated to accept the reports and testimony of the plaintiff's experts.[17] Nevertheless, the fact that hydrologic changes would occur did not necessarily mean that those changes would adversely affect wetland area no. 4. "The question is whether there *will* be a specific adverse impact. . . . The [plaintiff] submitted expert evidence that such an impact will not occur. In the absence of any evidence, the [defendant] may not conclude to the contrary." (Citation omitted.)

In its appellate brief, the defendant claims that remarks made by Danzer concerning the hydrology at the site provide substantial evidence for the denial of the wetlands permit. Danzer stated that the plaintiff's proposed activities would "result in many hydrological changes which will ultimately impact the wetlands and watercourses on site," that "there are still valid concerns about the permanent and adverse alterations of

---

[17] Although the defendant was the arbiter of the credibility of witnesses and, therefore, was not bound to accept the reports and testimony of the plaintiff's experts, the conclusions provided by them cannot be ignored if they were the only factually based conclusions before the defendant substantiated by evidence in the record. See *Cornacchia* v. *Environmental Protection Commission,* 109 Conn. App. 346, 356, 951 A.2d 704 (2008).

the internal functional hydrology of the wetlands" that had not been addressed, that "more intensive study is needed" and that the plaintiff should prepare water budgets pre- and post-development to "guarantee" that the wetland complex would not be starved of groundwater. Even if there was no evidence of any specific harm to the wetland area, the defendant argues, it nevertheless was not required to accept the plaintiff's evidence and it could conclude that the plaintiff failed to demonstrate there was no negative impact to the wetland area.

We agree with the trial court that the record does not contain substantial evidence of an adverse impact to wetland area no. 4. The emphasis during the proceedings before the defendant was that there would be changes to the hydrology, but evidence as to any adverse impact resulting from those changes was not presented. With expert testimony and documentation concluding to the contrary, the defendant was not free simply to assume that there would be a negative impact because of the size and the scope of the proposed development. Danzer's remarks, as characterized by the court, were general concerns and did not rise above speculation. "[A] finding of potential generalized impacts is insufficient to support a denial of an application for a permit to conduct a regulated activity. The commission must make a determination that the activity will have a likely adverse impact on the wetlands and watercourses and that finding must be supported by substantial evidence in the record." *Cornacchia* v. *Environmental Protection Commission*, 109 Conn. App. 346, 356, 951 A.2d 704 (2008).

The defendant further argues that, if it chose not to believe Logan's evidence as to the hydrologic impact to wetland area no. 4,[18] it then was left without any

---

[18] We note that "an agency cannot capriciously ignore the testimony of expert witnesses." *Strong* v. *Conservation Commission*, 28 Conn. App. 435, 441, 611 A.2d 427 (1992), appeal dismissed, 226 Conn. 227, 627 A.2d 431 (1993).

evidence to demonstrate that the wetlands would not be negatively impacted by the proposed development. Because the applicant has the burden of proving that it met the necessary criteria for the issuance of a permit; *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 593, 628 A.2d 1286 (1993); it did not meet that burden if the critical evidence is discounted. On appeal, the defendant argues that the plaintiff "failed to provide the data and empirical evidence necessary to conclude that there was no negative hydrologic impact to the wetlands."

During oral argument before this court, the defendant relied on *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, 293 Conn. 93, 977 A.2d 127 (2009), as support for its position that it properly denied the application because the plaintiff failed to provide sufficient evidence that there would be no adverse impact to the wetlands. *Unistar* was decided after the appellate briefs were filed in this case. As noted by the defendant, Danzer stated that the plaintiff should provide water budgets and other data before the defendant could be convinced that no negative impact would result from the hydrologic changes to the site.

Although the defendant's brief and reply brief filed with the trial court make mention of the need for additional information, during the trial court proceedings the defendant focused on its claim that there was substantial evidence in the record to support its determination that the plaintiff's proposed development would result in adverse impacts to the wetlands. The defendant now emphasizes that there is substantial evidence in the record to support the denial on the basis of the lack of information provided by the plaintiff. The defendant is correct that *Unistar* holds that an inland wetlands agency properly may deny an application for a wetlands permit if there is substantial evidence to support the agency's determination that the application

was incomplete. In *Unistar*, however, the stated reason for the denial was the lack of certain information, including a sufficiently detailed wildlife inventory and an analysis of alternatives to the proposed activity. *The application was denied without prejudice because the application was incomplete;* id., 119; *and the agency never reached the issue of whether the wetlands on the property would be impacted adversely by the plaintiff's revised development plan.* Id., 102–103.

In the present case, the court never addressed the issue of whether there was substantial evidence in the record to show that the plaintiff's application was incomplete. If the defendant's briefs squarely placed that issue before the court, then the court failed to discuss it in its memorandum of decision. We cannot determine whether the issue, as framed now, on appeal, was argued before the trial court at the hearing held on August 9, 2004, because the defendant has not provided us with a transcript of that proceeding.

If the court considered this claim and rejected it, we do not have the court's factual and legal basis for that determination. It is the defendant's responsibility to provide this court with an adequate record for our review. See Practice Book § 61-10. The court's memorandum of decision makes no mention of the lack of water budgets or any other data or information that the defendant now claims was the basis for the denial. "It is well settled that [a]n articulation [pursuant to Practice Book § 66-5] is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . The . . . failure to seek an articulation of the trial court's decision to clarify the aforementioned issues and to preserve them

properly for appeal leaves this court without the ability to engage in a meaningful review." (Internal quotation marks omitted.) *Chyung* v. *Chyung*, 86 Conn. App. 665, 676, 862 A.2d 374 (2004), cert. denied, 273 Conn. 904, 868 A.2d 744 (2005). It is not the function of this court on review to engage in speculation.[19]

C

The defendant, as an additional ground for its denial of the plaintiff's application, found that "the current application will result in the total loss of the pocket of wetlands at 152 Circle Drive" due to the hydrologic changes in that area caused by the construction of the development. On appeal, it argues that there is substantial evidence in the record to support that reason, citing the testimony previously referred to in part I B of this opinion, and additional testimony by Danzer, Mrozinski and Robert F. Good, Jr.[20]

In its memorandum of decision, the court first noted that the pocket wetland is located on property adjacent to 140 Circle Drive, which is a .25 acre parcel on which the plaintiff planned to construct an emergency access route to the development as required by the town's zoning commission. This off-site, man-made wetlands is 360 square feet and consists of a drainage ditch and earthen berm. The court determined that there was no evidence in the record that the pocket wetland would be " 'totally' " lost, as found by the defendant. The evidence

---

[19] In *Unistar*, the court recognized that there could be situations in which an agency's request for additional information is not reasonable. "[T]here may be a situation in which the distance between the regulated area and the areas on the property for which an inventory is requested is so remote and makes it so unlikely that the activity could have any effect on the wetlands that it would be arbitrary and capricious for the commission to impose such a demand on an applicant." *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 111 n.15.

[20] Robert F. Good, Jr., employed by Leggette, Brashears & Graham, Inc., was the town's consulting geologist.

indicated that the watershed serving that wetland would be reduced from 2.4 acres to .99 acres, but that enough water still would flow into that wetland to maintain it. Although Mrozinski expressed concerns that the wetland would be "dewatered" by the proposed development, the court concluded that he had provided no support for that opinion.

We agree that the record does not provide substantial evidence for the defendant's finding that the pocket wetland would be totally lost because of the hydrologic changes to the site. As already discussed in part I B of this opinion, there is no evidence of any specific adverse impact to the wetlands caused by the hydrologic changes to the site. The additional referenced statements of Danzer, Mrozinski and Good do not alter that determination. Danzer stated that "[t]he cutting and filling as proposed will obviously directly and permanently impact the headwaters of this drainage area." Good opined that "[t]he majority of the existing watershed contribution to the pocket wetland will be redirected by the proposed development . . . ." Mrozinski stated that "[t]he filling of these wetlands or the areas upslope of this drainageway will change surface and groundwater flow. Proposed construction and landscape modifications will dewater this drainageway and [a]ffect the hydrologic regime." These statements of general concerns are insufficient to deny the application, and any conclusions of total "dewatering" are unsupported by the record.

Although the plaintiff, in its presentation before the defendant on the permit application, acknowledged that there would be *some impact* to the pocket wetland, there is no support for the defendant's determination that it would be "totally lost." Moreover, as argued by the plaintiff, although there is a small impact, it is unavoidable because of the necessity of the emergency access as required by the zoning commission. Moreover,

no evidence supports the defendant's finding that any impact necessarily would be adverse. Accordingly, this stated ground is legally insufficient to deny the plaintiff's permit application.

## D

The final reason given by the defendant for the denial of the plaintiff's application was the potential for acid generation from the rock exposed by blasting at the site. Specifically, the defendant stated that there was "the considerable likelihood of pollution of the wetland areas abutting to the west of Pumpkin Ground Brook due to acid drainage generated from groundwater and surface drainage flow over exposed bedrock." The defendant further found that "acid concentrations in surface and ground water resulting from exposure to oxidized bedrock will enter and pollute and negatively impact the wetland areas adjacent to Pumpkin Ground Brook" and that "the information provided by the [plaintiff] giving the discovery of potential acid producing rock, is insufficient to fully quantify the scope and extent of the problem and the engineering constraints of proposed mitigation solutions and the degrees of mitigation are uncertain." Although the defendant concurred with the plaintiff's experts that dilution would likely minimize any impact from acid drainage in Pumpkin Ground Brook, the defendant remained concerned about the wetlands abutting the brook "where the proposed land cover alterations of its contributing watershed represents a very significant proportion of the total flow into those wetlands, and where the acidic water would be the source of hydration to those wetlands."

In reviewing this ground for denial of the permit, the court stated that the only evidence in the record to support a finding of potential acid generation from the rock was the discovery of small amounts of pyrite by

the plaintiff's expert geologist. The pyrite was found in approximately 1 percent of the content of the rock that he examined, but the plaintiff presented reports and testimony from two experts who opined that the risk of any harmful acid draining from the bedrock into the wetland area was small.[21] In addition to the fact that there were very small amounts of pyrite present in the rock, the plaintiff stated that the conditions necessary for the acid formation would not occur because the excavated rock would be removed promptly from the site to prevent its contact with stormwater, the stormwater would be retained in a closed system during construction and no rock crushing would be done on site.[22]

Further, the court stated that although the defendant was free to reject the plaintiff's expert evidence, which concluded that the potential for environmental impact due to acid rock drainage was minimal, it was not entitled to conclude that the opposite was true without any evidence to justify that conclusion. See *Builders Service Corp.* v. *Planning & Zoning Commission,* 208 Conn. 267, 292–93, 545 A.2d 530 (1988). The court noted that Good, the expert relied on by the defendant, neither

[21] As noted by the trial court, the defendant has acknowledged that any potential acid drainage would not affect Pumpkin Ground Brook, but only the adjacent wetland area no. 4.

[22] The defendant had expressed concern during the public hearing on the plaintiff's initial application that acid drainage could occur if sulfur-containing rock blasted at the site was exposed to ground or surface water. With respect to the revised application, the uncontradicted evidence relative to acid drainage was that the potential for acidification from removed rock was a direct function of the degree of crushing, which increased the rock surface area exposed to water. If the crushed rock was left exposed on site for long periods of time, the potential for acidification became greater. At the public hearing on the revised application, the plaintiff represented that it would have a monitor on site on a daily basis to check pH levels, that it would not stockpile large amounts of small sized material, that blasted material would be taken off site in less than two weeks and that there would be no crushing of the blasted rock on site.

concluded that acid concentrations would enter the wetland area nor that any such entry would pollute and negatively affect it. Accordingly, the court found that the stated ground for denial was insufficient.[23]

On appeal, the defendant quotes from Good's report, which was the expert report referred to by the court in its memorandum of decision, and argues that his conclusions form a proper basis for the defendant's denial of the application. Good concluded: "Simply stated, the results of this investigation indicate there is a *potential* for the rock exposed by blasting and blast rock used as fill on the property to be acid generating. This *potential* cannot be fully understood without a better understanding of the distribution of acid generating rock and storm water and groundwater interaction with these rock surfaces." (Emphasis added.) The defendant claims that because Good identified the potential for acid rock generation, the plaintiff failed in its proof to demonstrate that there would be no adverse impact from acid rock drainage by failing to provide the necessary data to reach that conclusion. In other words, as in part I B of this opinion, the defendant is claiming that there is substantial evidence in the record to support the denial on the basis of the lack of information provided by the plaintiff.

We agree with the court that Good's identification of the "potential" for acid generation is not sufficient to meet the substantial evidence test as articulated in *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 57. With

---

[23] After reviewing the record for substantial evidence to support the defendant's four grounds for denial of the permit, and finding none, the court stated: "The [defendant's] conclusions as to each of the grounds for denying the [plaintiff's] application can accurately be characterized as combining the aphorism, 'Anything's possible,' with Murphy's Law, that 'anything that can go wrong will go wrong.' "

respect to the claim that the plaintiff's lack of information was the basis for the denial, we note that the defendant, in its appellate brief, states that "[t]he court in its analysis . . . ignored the substantial testimony and evidence in the record as to the data and testing necessary to establish whether or not [the presence] of iron oxidizing metals would result in acid drainage which would negatively impact the wetlands." As we discussed in part I B of this opinion, we have no transcript of the hearing before the trial court from which to determine whether the issue, as now framed on appeal, was raised. Further, because the memorandum of decision did not address the issue, we have no way of determining whether the court considered it and found it without merit.[24] The defendant did not file a motion for articulation with the trial court. "The . . . failure to seek an articulation of the trial court's decision to clarify the aforementioned issues and to preserve them properly for appeal leaves this court without the ability to engage in a meaningful review." (Internal quotation marks omitted.) *Chyung* v. *Chyung*, supra, 86 Conn. App. 676.

## II

The defendant's final claim is that the court improperly ordered the defendant to issue the wetlands permit rather than simply sustaining the plaintiff's administrative appeal. The defendant argues that the court has judicially usurped the administrative function of the

---

[24] Charles W. Dimmick, a certified professional geologist, made the following statements at the public hearing on the plaintiff's revised application: "So finding some pyrite in one of these samples is the exception and not the rule. Yes, it's always possible [that there could be more pyrite]; it's possible you could drill down there and find a vein of gold and abandon the project and find something else to do. . . . As to the cost benefit to the thing, there is such a low risk of acid potential here that there is no real benefit for putting extra holes for this particular purpose [to obtain additional samples to test for pyrite], in my considered judgment."

defendant by directing it to take a particular action. We disagree.

After concluding that there was not substantial evidence in the record to support the defendant's denial of the plaintiff's application for a wetlands permit, the court reversed the defendant's decision and remanded the matter to the defendant "for further consideration of any conditions that should be attached to the issuance of the permit as supported by evidence in the present record." (Internal quotation marks omitted.) Although the court directed the defendant to issue the permit, it recognized the defendant's authority to attach reasonable conditions in accordance with the evidence already presented in connection with the application.

When it appears that a land use agency reasonably could reach only one conclusion, the court may direct that agency to do that which the conclusion requires. *Jersey* v. *Zoning Board of Appeals*, 101 Conn. App. 350, 361, 921 A.2d 683 (2007). Under the circumstances of this case, we agree that there was but one conclusion that the defendant could reach and that the court properly ordered the issuance of the permit rather than simply sustaining the plaintiff's administrative appeal.

The judgment is affirmed.

In this opinion the other judges concurred.