******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

AMERICAN INSTITUTE FOR NEURO-INTEGRATIVE
DEVELOPMENT, INC. *v.* TOWN PLAN AND
ZONING COMMISSION OF THE
TOWN OF FAIRFIELD
(AC 40102)

Keller, Moll and Lavery, Js.

*Syllabus*

The plaintiff appealed to the trial court from the decision by the defendant
Town Plan and Zoning Commission of the Town of Fairfield (commis-
sion) denying its application for a special exception to use a portion of
a former high school building it owned, which was located in a residential
zone, to provide educational, vocational and other services to individuals
with severe learning disabilities. The trial court rendered judgment dis-
missing the appeal, from which the plaintiff, on the granting of certifica-
tion, appealed to this court. *Held*:

1. The commission's conclusion that the plaintiff had not satisfied certain
   traffic related requirements under the town zoning regulations was
   improper, as the commission's ground for denying the special exception
   application was not supported by the record: the plaintiff presented
   testimony from an expert witness concluding that the roads could ade-
   quately accommodate the anticipated additional traffic generated, and
   although neighbors disagreed with the analysis of the plaintiff's expert,
   their comments concerning the adequacy of the streets to accommodate
   traffic and prospective hazards or congestion addressed matters of pro-
   fessional expertise, the neighbors did not purport to have the training
   or skills needed to properly assess traffic impact, nor did they offer an
   expert's opinion on their behalf, and their comments, thus, amounted
   to generalized concerns about hypothetical effects of increased traffic;
   moreover, the commission's conclusion essentially turned on public
   testimony regarding the mere potential for adverse effects to the neigh-
   borhood, which did not constitute substantial evidence.

2. The commission's other stated reason for denying the plaintiff's applica-
   tion, namely, that the plaintiff did not demonstrate that the proposed
   offices for charitable institutions would be nonprofit entities, was not
   supported by the record; in making its application, the plaintiff agreed
   to be bound by a condition that it would lease the office spaces only
   to nonprofit charitable corporations, that use was consistent with the
   zoning regulations, and, therefore, despite that express agreement and
   the absence of evidence that the proposed use would not be a permitted
   use, the commission's denial of the plaintiff's application on the basis
   of a concern that a for-profit entity might operate on the property was
   based on speculation.

Argued December 5, 2018—officially released April 23, 2019

*Procedural History*

Appeal from the decision of the defendant denying
the plaintiff's request for a special exception, brought
to the Superior Court in the judicial district of Fairfield
and tried to the court, *Hon Richard P. Gilardi*, judge
trial referee; judgment dismissing the appeal; thereafter,
the court denied the plaintiff's motion to reargue, and
the plaintiff, on the granting of certification, appealed
to this court. *Reversed*; *judgment directed*.

*Michael T. Bologna*, with whom was William J. Fitzpa-
trick, for the appellant (plaintiff).

*Stanton H. Lesser*, for the appellee (defendant).

*Opinion*

LAVERY, J. The plaintiff, American Institute for Neuro-Integrative Development, Inc., appeals from the judgment of the trial court dismissing its appeal from the decision of the defendant, the Town Plan & Zoning Commission of the Town of Fairfield (commission), in which the commission denied the plaintiff's request for a special exception pursuant to § 27.0 of the Fairfield Zoning Regulations (regulations). On appeal, the plaintiff claims that the trial court erred when it concluded that the commission properly denied the plaintiff's special exception application on the basis of (1) concerns about increased off-site traffic, and (2) the plaintiff's inability to identify specific tenants that would occupy the proposed office spaces. We reverse the judgment of the trial court.

The record reveals the following facts. The plaintiff, a Connecticut 501 (c) (3) nonprofit corporation, owns an approximately 11.7 acre parcel of land at 309 Barberry Road in the Southport section of Fairfield. The property is located in a AA residential zone and is solely accessible by a private driveway off the Barberry Road cul-de-sac. The property contains two buildings: a former parochial elementary school, which the plaintiff now occupies; and the former Christ the King preparatory high school, which currently stands vacant but previously had hosted 132 students and ten faculty and staff adults.

In the former elementary school building, the plaintiff operates its Giant Steps School (Giant Steps), a private school that provides educational and therapeutic services for students with complex neurobiological based learning and developmental disorders. Giant Steps is approved by the Connecticut Department of Education to serve up to forty students between two and sixteen years of age.

The plaintiff wishes to use the former high school building for its proposed project, Next Steps. Next Steps would provide continued educational, vocational, and other services to Giant Steps graduates with severe learning disabilities, as well as to similarly situated adults, who otherwise would be ineligible for many programs after reaching twenty-one years of age.

On June 16, 2015, pursuant to § 27.0 of the regulations, the plaintiff applied to the commission for a special exception, requesting permission to use part of the former high school building for Next Steps. The application proposed designating six rooms in the building to host nonprofit agencies that would agree to provide vocational training opportunities to these young adults with severe learning disabilities. Section 27.0 of the regulations governs the granting of special exceptions. Section 5.1.4 of the regulations specifically enumerates the various special exception uses in all

residential districts. As provided in the regulations, such permitted uses, subject to the securing of a special exception pursuant to § 27.0 of the regulations, include, inter alia, "schools" and "charitable institutions," provided they are "not conducted as a business, or for profit . . . ." Fairfield Zoning Regs., § 5.1.4 (d).

On July 14, 2015, the commission held a public hearing on the plaintiff's application. Attorney William Fitzpatrick appeared on behalf of the plaintiff and offered presentations from, inter alia, engineers and the founder and executive director of Giant Steps, Kathy Roberts, detailing how the plaintiff's proposal complied with the technical requirements of the applicable regulations. The commission reconvened on July 28, 2015, for public comment, during which time it heard both support for and opposition to the plaintiff's application. A common thread among the neighbors who appeared in opposition to the application was concern about possible adverse effects caused by the anticipated increased traffic volume in the neighborhood.

On August 25, 2015, the commission voted five to two to deny the plaintiff's application. On August 28, 2015, notice of this decision was published in the Fairfield Citizen.[1] The plaintiff, thereafter, timely appealed to the Superior Court, claiming that the commission's decision lacked support in the record.[2] Following an April 21, 2016 hearing, the court dismissed the plaintiff's appeal, concluding that the commission properly denied the plaintiff's application. Subsequently, the plaintiff filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o) and Practice Book § 81-1, which this court granted. Additional facts and procedural history will be set forth as needed.

As a preliminary matter, we consider whether the commission has provided a collective statement setting forth its reasons for denial. "Where a zoning agency has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . The principle that a court should confine its review to the reasons given by a zoning agency does not apply to any utterances, however incomplete, by the members of the agency subsequent to their vote. It applies where the agency has rendered a formal, official, collective statement of reasons for its action. . . .

"[F]ailure of the zoning agency to give such reasons requires the court to search the entire record to find a basis for the commission's decision." (Citations omitted; internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 544, 600 A.2d 757 (1991). "The search is conducted against the backdrop of the particular regulation under

which the plaintiff sought approval of its application." *Smith-Groh, Inc.* v. *Planning & Zoning Commission*, 78 Conn. App. 216, 227, 826 A.2d 249 (2003).

In the present case, the notice of the commission's decision, published in the August 28, 2015 edition of the Fairfield Citizen, states: "309 Barberry Road Special Exception application of the American Institute for Neuro [Integrative] Development Inc., to establish a school and offices for charitable institutions in an existing building. DENIED." The reasons for the denial are not set forth in the published notice. On that same date, a clerk for the commission, however, wrote the plaintiff's counsel a letter providing the following three purported reasons for the commission's denial: "(1) In accordance with [§] 27.4.1 of the [regulations] it has not been demonstrated that the location, type, character and size of use will be in harmony with and conform to appropriate and orderly development of the neighborhood, and will not hinder or discourage appropriate development and use of adjacent property or impact its value. (2) In accordance with [§] 27.4.3 of the [regulations] it has not been demonstrated that the streets serving the proposed use shall be adequate to carry prospective traffic and that provisions for entering or leaving the site have been made to avoid hazard or congestion. (3) It has not been demonstrated that the proposed use is a permitted use in that there is no evidence that the proposed offices for charitable institutions will be [nonprofit] entities nor has [it] been demonstrated that the proposed use is a compliant education facility."[3]

Although our case law directs that we not rely on a letter that was not adopted by the commission to evince the commission's collective decision; see *Smith-Groh, Inc.* v. *Planning & Zoning Commission*, supra, 78 Conn. App. 224–26 (concluding that letter to applicant's attorney from town planner, purporting to state reasons for commission's denial of application for site plan approval and special permit, was not collective statement of commission's decision, given that commission had not adopted letter, and stating that "[a]lthough the reasons outlined in the letter were discussed by the commission during either the public hearing or the special meeting, the planner could not speak for the commission"); because the parties in the present case agree that the letter properly sets forth the reasons for the commission's decision and do not claim that the August 28, 2015 letter should not be considered, we will, for purposes of this case, consider the reasons set forth in the letter.

We now set forth general principles governing special permit or special exception review procedures. At the outset, we note that the terms "special exception" and "[s]pecial permit" are interchangeable. (Internal quotation marks omitted.) *Beckish* v. *Planning & Zoning*

*Commission*, 162 Conn. 11, 15, 291 A.2d 208 (1971). "[T]he function of a special [exception] is to allow a property owner to use his property in a manner expressly permitted under the zoning regulations, subject to certain conditions necessary to protect the public health, safety, convenience, and surrounding property values. . . . The basic rationale for the special [exception] [is] . . . that while certain [specially permitted] land uses may be generally compatible with the uses permitted as of right in particular zoning districts, their nature is such that their precise location and mode of operation must be regulated because of the topography, traffic problems, neighboring uses, etc., of the site. Common specially permitted uses, for example, are hospitals, churches and schools in residential zones. These uses are not as intrusive as commercial uses would be, yet they do generate parking and traffic problems that, if not properly planned for, might undermine the residential character of the neighborhood. If authorized only upon the granting of a special [exception] which may be issued after the [zoning commission] is satisfied that parking and traffic problems have been satisfactorily worked out, land usage in the community can be more flexibly arranged than if schools, churches and similar uses had to be allowed anywhere within a particular zoning district, or not at all." (Citation omitted; internal quotation marks omitted.) *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, 176 Conn. App. 570, 585–86, 170 A.3d 73 (2017).

"When ruling upon an application for a special permit, a planning and zoning board acts in an administrative capacity. . . . Generally it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The [Appellate Court and] trial court . . . decide whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . . In applying the law to the facts of a particular case, the board is endowed with a liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal. . . .

"Although . . . the zoning commission does not have discretion to deny a special [exception] when the proposal meets the standards, it does have discretion to determine *whether* the proposal meets the standards set forth in the regulations. If, during the exercise of its discretion, the zoning commission decides that all of the standards enumerated in the special [exception] regulations are met, then it can no longer deny the application. The converse is, however, equally true. Thus, the zoning commission can exercise its discretion during the review of the proposed special exception, as it applies the regulations to the specific application

before it." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 627–28, 711 A.2d 675 (1998).

"In reviewing a challenge to a commission's administrative decision, we . . . must be mindful of the fact that . . . the applicant . . . bore the burden of persuading the commission that it was entitled to the permits that it sought under the zoning regulations." (Internal quotation marks omitted.) *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. App. 586. "[T]he reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . . *Evidence of general environmental impacts, mere speculation, or general concerns do not qualify as substantial evidence.*" (Emphasis in original; internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, 130 Conn. App. 69, 75, 23 A.3d 37, cert. denied, 303 Conn. 908, 32 A.3d 961, 962 (2011). With this context in mind, we turn our attention to the plaintiff's claims.[4]

## I

The plaintiff first challenges the court's conclusion that the commission's denial could be upheld on the basis of the neighbors' general traffic concerns. The plaintiff contends that § 27.4.3 of the regulations sets forth specific requirements, which the plaintiff maintains it has satisfied. In comparison, the plaintiff contends that the neighbors' concerns were too generalized to support the commission's purported reasons for denial under § 27.4.3. We agree.

"[W]hen a landowner has submitted an application for a permitted use, the zoning commission may consider off-site traffic conditions only for the limited purpose of reviewing the internal traffic circulation on the site and determining whether the location of the proposed [roads and driveways] would minimize any negative impact of additional traffic to the existing traffic . . . . This is because [t]he designation of a particu-

lar use of property as a permitted use establishes a conclusive presumption that such use does not adversely affect the district and precludes further inquiry into its effect on traffic, municipal services, property values, or the general harmony of the district. . . . [Our Supreme Court] has limited the application of these principles, however, to site plan approvals and subdivision applications that involve uses that are permitted as of right within the zoning district. . . .

"In contrast, when a use is not allowed as of right, but only by special exception, the zoning commission is required to judge whether any concerns, such as parking or traffic congestion, would adversely impact the surrounding neighborhood. . . . The reason for this requirement is that, although such uses are not as intrusive as commercial uses . . . they do generate parking and traffic problems that, if not properly planned for, might undermine the residential character of the neighborhood. . . . Thus, there is no presumption that a specially permitted use, or the traffic that it will generate, necessarily is compatible with any particular neighborhood within the zoning district." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 431–33, 941 A.2d 868 (2008).

In the present case, the commission specified that the plaintiff's special exception application did not comply with certain requirements set forth in § 27.4.3 of the regulations.[5] The letter stating the commission's reasons for denial indicated that the plaintiff had not demonstrated that "the streets serving the proposed use shall be adequate to carry prospective traffic and that provisions for entering or leaving the site have been made to avoid undue hazard or congestion." Accordingly, we will review the record as to the adequacy of the streets to carry the prospective Next Steps traffic and will further determine whether the record supports a conclusion that prospective traffic will result in "undue hazard . . . or congestion"; Fairfield Zoning Regs., § 27.4.3; as these concerns are central to the commission's stated reason for denial under § 27.4.3 of the regulations.

The mere fact that a proposal will generate increased traffic volume is not, in itself, an indication that such traffic will result in "undue hazard . . . or congestion"; to determine whether the proposal will result in "undue hazard . . . or congestion," we review the record as to the proposal's projected impact on traffic conditions. See *CMB Capital Appreciation, LLC* v. *Planning & Zoning Commission*, 124 Conn. App. 379, 399, 4 A.3d 1256 (2010) ("while traffic problems and related safety concerns can be a valid reason for a denial . . . there must be more than a traffic increase, and either traffic congestion or an unsafe road design at or near the

entrances and exits from the site" [internal quotation marks omitted]), cert. granted on other grounds, 299 Conn. 925, 11 A.3d 150 (2011) (appeal withdrawn September 15, 2011); see also *Daughters of St. Paul, Inc.* v. *Zoning Board of Appeals*, 17 Conn. App. 53, 69, 549 A.2d 1076 (1988) (projected additional twenty vehicles per day not sufficient evidence of detrimental traffic congestion). As our Supreme Court has explained: "[T]he significance of the impact should not be measured merely by the number of additional vehicles but by the effect that the increase in vehicles will have on the existing use of the roads. An increase of 100 vehicles per hour may have a negligible impact at one time or location and a ruinous impact at another time or location. In making this determination, the commission may rely on statements of neighborhood residents about the nature of the existing roads in the area and the existing volume of traffic, and its own knowledge of these conditions." *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 434.[6]

"[Our Supreme Court has] permitted a commission composed of experts to rely on its own expertise within the area of its professional competence; *Jaffe* v. *State Department of Health*, 135 Conn. 339, 349–50, 64 A.2d 330 (1949); but in that case [the court] recognized as well that expert testimony may be required when the question involved goes beyond the ordinary knowledge and expertise of the trier of fact." (Internal quotation marks omitted.) *Feinson* v. *Conservation Commission*, 180 Conn. 421, 428, 429 A.2d 910 (1980). "If an administrative agency chooses to rely on its own judgment, it has a responsibility to reveal publicly its special knowledge and experience, to give notice of the material facts that are critical to its decision, so that a person adversely affected thereby has an opportunity for rebuttal at an appropriate stage in the administrative proceedings." Id., 428–29. Although "an administrative agency is not required to believe any of the witnesses, including expert witnesses . . . it must not disregard the only expert evidence available on the issue when the commission members lack their own expertise or knowledge." (Citation omitted.) *Tanner* v. *Conservation Commission*, 15 Conn. App. 336, 341, 544 A.2d 258 (1988).

This court's decision in *Gevers* v. *Planning & Zoning Commission*, 94 Conn. App. 478, 486, 892 A.2d 979 (2006), is instructive. In that case, the plaintiffs claimed, inter alia, that the trial court "improperly concluded that substantial evidence supported the commission's finding that the proposed use would not unduly impair pedestrian safety . . . ." Id., 480. In support of their special exception application, the applicants offered an expert traffic study that concluded that "the introduction of traffic generated by [the project] will not disrupt the continuity of traffic flow on the adjacent roadway

system. Roadway conditions remain virtually unchanged with the addition of the site-generated traffic." (Internal quotation marks omitted.) Id., 484. An expert further opined at public hearings on the prospective impact on traffic and pedestrian safety, stating that the project was "going to have a very small impact on the roadway network," and that he did not observe any people walking or "riding of bicycles" during his time studying the area. (Internal quotation marks omitted.) Id. Those opposed to the proposal "presented no traffic studies or expert testimony regarding the issue of pedestrian safety." Id., 485–86. On appeal from that commission's decision granting the special exception, the plaintiffs did not refer this court "to any evidence in the record that contradict[ed] the aforementioned [expert] evidence . . . ." Id., 486. Accordingly, this court concluded that "[u]nless presented with evidence that undermines either the credibility or the ultimate conclusions of an expert, the commission must credit expert testimony." Id., citing *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 156–57, 653 A.2d 798 (1995).

In the present case, the plaintiff's expert traffic engineer, Michael Galante, was the only expert to address any prospective traffic impact.[7] First, Galante estimated that Next Steps would generate the following two-way traffic volumes: for office staff, seven vehicles around 9 a.m. and six vehicles around 5 p.m.;[8] for students, twenty-one vehicles between 10 a.m. and 2 p.m.; and for staff, thirty-six vehicles between 9:30 a.m. and 2:30 p.m.[9] Galante further noted that around 2 p.m. on weekdays, the time period he described as the "worst case" in terms of traffic volume, both Next Steps and Giant Steps would be dismissing students at the same time. During that time, the schools would generate a two-way traffic volume of 131 vehicles around the Barberry Road and Mill Hill Road intersection.

Galante's traffic impact study did not solely focus on the percentage of increased traffic volume; he additionally assessed vehicle delay and the streets' levels of service.[10] "Traffic engineers have standards for level of service to measure traffic congestion with Service Level A as negligible traffic and Service Level F as serious congestion for signalized and unsignalized intersections. These levels measure the quality of flow of vehicles and delay at intersections . . . . For signalized intersections, Level A has a stopped delay per vehicle of less than five seconds." R. Fuller, 9B Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 49:15, p. 148. Referencing these standards, Galante indicated that traffic delay would be "at most [0.5] seconds per vehicle during [peak] time period[s]," such that the level of service for these roads would remain at level A, which Galante described as "the best condition from a traffic perspective . . . ."

One commissioner observed: "[The plaintiff's pro-

posal] was an example, at least statistically, of one of the least in terms of total impact when you look at the statistical traffic report. . . . [T]he use of the school is small enough that the true [everyday] impact [does not] . . . [rise] to the level of real safety issue." As to safety, there were no reported accidents in the neighborhood between the years 2011 and 2013,[11] and, given such minimal impact on traffic conditions, Galante indicated that he did not have cause for concern as to potential for increased accidents under the plaintiff's proposal. Accordingly, Galante concluded that the roads adequately could accommodate the anticipated additional traffic generated by Next Steps without changing the level of service, and also indicated that "from a traffic engineering perspective the road's not considered congested. It can handle the additional traffic."

Neighbors disagreed with the plaintiff's expert analysis on the basis of their daily experiences with traffic in the neighborhood. Several neighbors indicated that they regularly observe heavy traffic volume[12] and unsafe drivers in the neighborhood.[13] The neighbors surmised that Next Steps traffic might both result in traffic congestion and further aggravate the unsafe traffic conditions that they claimed to experience.[14]

Connecticut courts have held that public testimony is not to be considered substantial evidence when "it is not supported by anything other than speculation and conjecture on the part of those objecting to the [party's] proposed activities." *Martland* v. *Zoning Commission*, 114 Conn. App. 655, 665–66, 971 A.2d 53 (2009), citing *Bethlehem Christian Fellowship, Inc.* v. *Planning & Zoning Commission*, 73 Conn. App. 442, 463, 807 A.2d 1089, cert. denied, 262 Conn. 928, 814 A.2d 379 (2002). In *Martland*, this court concluded that generalized concerns of two laypersons who opposed the plaintiffs' proposed activities were "not substantial because [their concerns were] not supported by anything other than speculation and conjecture . . . [as neither layperson] indicated any type of expertise that would buttress their lay opinion . . . ." (Citation omitted.) *Martland* v. *Zoning Commission*, supra, 665–66.

In the present case, the neighbors' remarks as to prospective traffic impact suffer from the same deficiency. While the commission could take into consideration the neighbors' concerns and observations as to current road conditions, the neighbors' remarks as to the adequacy of the streets to accommodate traffic and prospective hazards or congestion addressed matters of professional expertise. See *Gevers* v. *Planning & Zoning Commission*, supra, 94 Conn. App. 485–86 (plaintiffs offered no expert traffic analysis rebutting expert conclusions regarding pedestrian safety and traffic impact). The neighbors did not purport to have the training or skills needed to properly assess traffic

impact, nor did they offer an expert's opinion on their behalf. Accordingly, their comments amounted to generalized concerns about hypothetical effects of increased traffic.

To the extent the commission relied on the neighbors' remarks, the commission's conclusion under § 27.4.3 of the regulations essentially turned on the mere potential for adverse effects. The mere possibility of an adverse outcome, without more, typically does not constitute substantial evidence. See *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, supra, 130 Conn. App. 88–89 (concluding mere "potential" adverse effect not substantial evidence [internal quotation marks omitted]). Thus, we conclude that the commission's assigned ground for denial under § 27.4.3 of the regulations is not reasonably supported by the record.[15] Therefore, the commission's conclusion that the plaintiff had not satisfied certain traffic related requirements under § 27.4.3 of the regulations was improper.

II

Mindful that "[t]he reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given"; (internal quotation marks omitted) *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, supra, 130 Conn. App. 75; we now address the propriety of the commission's remaining reason for denial. Specifically, the commission concluded: "It has not been demonstrated that the proposed use is a permitted use in that there is no evidence that the proposed offices for charitable institutions will be [nonprofit] entities . . . ." The plaintiff contends that this stated reason for denial is unavailing because it, in effect, requires the plaintiff to identify prospective users, whereas, to satisfy § 5.1.4 (d) of the regulations, the plaintiff need only identify the prospective use. We agree with the plaintiff.

The plaintiff aptly notes that § 5.1.4 of the regulations sets forth no requirements as to the identity of the user. In its special exception application, the plaintiff proposed using the vacant Christ the King preparatory school building as a "[c]ompanion [s]chool (Next Steps) [f]or [y]oung [a]dults" and as "[o]ffices for [nonprofit] [c]orporations."[16] At hearings before the commission, the plaintiff represented that the proposed office use would be permitted as a "charitable [institution]" pursuant to § 5.1.4 of the regulations. It further suggested that the commission "should make it a condition of approval . . . that [the occupants] be demonstrated to be [501 (c) (3) nonprofit corporations]."

During public comment, neighbors expressed concern that the nonprofits might operate in a business-like capacity and that a prospective occupant might

itself be a for-profit entity.[17] Echoing such concerns, a commissioner suggested that the plaintiff's inability to identify office occupants meant it did not commit to host only nonprofits: "The proposal is to provide leased space to . . . [nonprofits]. We don't know what those are going to be, we don't know what business they are going to be involved in, but they're not going to be charities. There was no commitment that they were going to be charities. Charities can be [for-profit] enterprises." Such concern was reflected in the third reason for denial provided in the initial letter to Fitzpatrick, which read: "It has not been demonstrated that the proposed use is a permitted use in that there is no evidence that the proposed offices for charitable institutions will be [nonprofit] entities . . . ." That conclusion is baseless.

In making its application, the plaintiff has agreed to be bound by a condition that it would lease the office spaces only to 501 (c) (3) nonprofit corporations. This use is consistent with the plain language of § 5.1.4 (d) of the regulations. Despite the plaintiff's express agreement, and the absence of evidence that the proposed use would not be a permitted use, the commission denied the application on the basis of a concern that a for-profit entity might operate in the building. Unless and until such event occurs, the commission's denial improperly was based on mere speculation. See *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, supra, 130 Conn. App. 75, 78.

The commission had before it no substantial evidence to support its decision to deny the plaintiff's application. Consequently, the only reasonable conclusion for the commission was to grant the application with reasonable conditions. See *Fanotto* v. *Inland Wetlands Commission*, 108 Conn. App. 235, 244–45, 947 A.2d 422 (2008), appeal dismissed, 293 Conn. 745, 980 A.2d 296 (2009).

The judgment is reversed and the case is remanded with direction to render judgment sustaining the plaintiff's appeal and directing the commission to approve the plaintiff's special exception application with reasonable conditions.

In this opinion the other judges concurred.

[1] General Statutes § 8-3c (b) provides in relevant part that "[n]otice of the decision of the commission shall be published in a newspaper having a substantial circulation in the municipality and addressed by certified mail to the person who requested or applied for a special permit or special exception . . . ."

[2] The plaintiff also claimed that the commission's denial was in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq. (2006). The court dismissed this claim, and the plaintiff did not appeal from that aspect of the court's decision. Therefore, we do not discuss the ADA claim in further detail.

[3] On October 1, 2015, after the plaintiff had filed its appeal to the Superior Court, however, a clerk for the commission then sent Fitzpatrick a new letter, containing the same first two reasons for denial, but modifying the third reason to state: "(3) It has not been demonstrated that the proposed use is a permitted use in that there is no evidence that the proposed [non-

profit] entities will be charitable institutions nor has it been demonstrated that the proposed use is a compliant educational facility." For purposes of the present appeal, this change is minor and does not bear on our decision. Unaware of any precedent that would permit the commission to modify its decision after the applicant has appealed to the Superior Court, we will disregard the October 1, 2015 letter.

[4] Before the Superior Court, the plaintiff noted that the letter to the plaintiff's counsel indicated, as the first reason for denial: "In accordance with [§] 27.4.1 of [the regulations] it has not been demonstrated that the location, type, character and size of the use will be in harmony with and conform to appropriate and orderly development of the neighborhood, and will not hinder or discourage appropriate development and use of adjacent property or impact its value." The plaintiff argued that there was not a basis in the record to support this conclusion; the commission agreed. Before this court the commission expressly declined to argue on that point. Accordingly, we do not review it.

Additionally, as part of the third reason for denial, both letters to Fitzpatrick indicated in relevant part: "It has not been demonstrated that the proposed use is a permitted use in that there is no evidence that . . . the proposed use is a compliant educational facility." Before this court, the commission conceded that this reason could not constitute an adequate basis for denial, in that Next Steps would qualify as a "[school]" pursuant to § 5.1.4 (d) of the regulations. Accordingly, to the extent that the commission may have based its denial on concerns that Next Steps would not be considered "a compliant educational facility," we conclude that this basis for the commission's denial also has been abandoned.

[5] Section 27.4.3 of the regulations provides: "[T]he streets serving the proposed use shall be adequate to carry prospective traffic, provision shall be made for entering and leaving the property without creating undue hazard to traffic or congestion and adequate off-street parking and loading shall be provided on the same lot in accordance with [§] 28.0 of [the regulations] . . . ."

[6] In *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 446, our Supreme Court ultimately affirmed the trial court's denial of the application on grounds other than traffic related concerns, stating: "In summary, we conclude that the trial court correctly determined that the record did not contain substantial evidence to support the commission's conclusion that the [plaintiff's] application for a special exception should be denied because . . . the temple would create unacceptable traffic congestion and hazards. . . . We further conclude, however, that the record contained substantial evidence to support the commission's denial of the [plaintiff's] application on the grounds that the level of activity at the proposed temple would not be in harmony with the general character of the neighborhood, that the temple would substantially impair neighboring property values, and that the proposed septic wastewater and water supply systems would create a health or safety hazard."

[7] Additionally, Philip Teso, an engineer, discussed plans to expand the existing access drive and to renovate the existing parking lot to accommodate teachers and nonprofit office staff.

[8] The commission inquired as to how Galante arrived at seven total vehicles for office staff even though the plaintiff's application contemplated four office staff for six offices, i.e., a total of twenty-four staff. Galante responded that he was only considering traffic conditions during a one hour time period and that staff would not all arrive and depart at the same time. Accordingly, he did not factor in all twenty-four staff at a given time but instead used standardized traffic volume estimates based on office square footage, per the Trip Generation handbook. See footnote 9 of this opinion.

[9] The source of this information was: "(1) 'Trip Generation,' 9th Edition, published by the Institute of Transportation Engineers (ITE), 2012 using General Office Building, Code #710 average rates. The weekday afternoon peak hour rates were used for the weekday [midafternoon] school departures peak hour, to be conservative. (2) Student's site traffic generation for the Next Steps program was developed based on discussions with the [plaintiff]. The program will accommodate up to [twenty-five] students, with [twenty-five] staff to assist each individual. (3) There will be [thirty-six] staff members on site every day. This includes [twenty-five] teachers, café and health care staff. It accounts for [five] staff from Giant Steps also working at Next Steps."

[10] Accordingly, although the precise number of additional vehicles remained a point of contention from both the perspectives of the commission

and of several neighbors who appeared in opposition to the proposal, Galante maintained that factoring in additional vehicles would not alter his overall street capacity analysis.

[11] Galante's traffic impact analysis report indicated: "Accident data was obtained from the Fairfield Police Department for a period beginning January 1, 2011 through December 31, 2013 for Barberry Road and Juniper Lane. For the intersection of Barberry Road at Mill Hill Road, there were no reported accidents. There were no reported accidents for the section of Barberry Road between Mill Hill Road and Juniper Lane East. There were no reported accidents for the intersection of Barberry Road at Juniper Lane East. There were no reported accidents for the section of Barberry Road between Juniper Lane East and West. There were no reported accidents for the intersection of Barberry Road at Juniper Lane West. There were no reported accidents for the section of Barberry Road between Juniper Lane West and School Access Drive. There were no reported accidents for the section Juniper Lane between Barberry Road North and South."

[12] For example, one neighbor commented that "[r]ight now the streets and single driveway are not adequate for the traffic that's there. . . . Right now the residents on the street have a hard time getting out of their driveways because there's so much traffic going by they can't go out."

[13] One neighbor observed: "We already have a current problem with the traffic . . . . There are cars speeding . . . around the corners. As you may or may not know, it's not a straight shot. It is a circle with some tough corners, it's very hard to see. . . . I live right around that bend and getting out of my driveway is incredibly tough. Numerous occasions I've been almost clipped. I've had people riding my tail down the street as slow as I go with my blinker on swerving not to hit me as I turn as best I can into my driveway." Another neighbor accounted: "Currently there always seems to be a very high volume of traffic throughout the day. There are times that the traffic is so heavy that I have actually had to get out of my car or have my son get out of the car and stop the traffic and ask them, please, let me get into my driveway so that I can park and get home because the cars just kept coming."

[14] For example, one neighbor specified: "The traffic is my biggest concern right now. And, again, we already have a problem." Other neighbors opined that increased traffic volume would lead to increased traffic parked on the street, which would then result in traffic congestion. One neighbor suggested: "[With increased traffic volume] the more people need to find places to park their cars the more likely that those cars are going to be parked on the road. . . . If people park on either side you're suddenly going to be faced with the inability to bring traffic in both directions." Another neighbor observed: "I will confirm that everything you've heard about the traffic congestion is absolutely true. . . . We have on street parking already and many times there is only one lane going through . . . ."

[15] Our conclusion on this point is instructive as to the requirement under § 27.4.3 of the regulations, as provided in the commission's reason for denial, that "provision shall be made *for entering and leaving the property* without creating undue hazard to traffic or congestion . . . ." (Emphasis added.) The commission's conclusion on this point is baseless given that the record does not support a finding that the proposal will result in undue hazard or traffic congestion.

[16] During argument before the Superior Court, the plaintiff indicated that the regulations permit a "charitable [institution]" to operate in Residence AA zoning, provided that such institutions are nonprofit. The plaintiff acknowledged that its initial application for a special exception described the proposed occupants as "nonprofits" but maintained that it made clear to the commission that each office would operate as a "charitable [institution]."

[17] One neighbor expressed concern that a nonprofit is a type of business that would be "operating in our residential neighborhood." The neighbors commonly referred to the proposed nonprofits as "businesses," with one such neighbor suggesting the neighborhood would have "businesses moving into a residential area. I'm sure right now it's part of the school, however, that's not to say that one day those businesses couldn't expand. . . . It could become this big thing they could have. Who knows what you can do."